STATE OF NORTH CAROLINA v. RALPH EDWIN HAMILTON

No. 217A93

(Filed 3 November 1994)

## 1. Criminal Law § 776 (NCI4th)— first-degree murder— insanity and voluntary intoxication—instructions

There was no error in a first-degree murder prosecution in which defendant was sentenced to life imprisonment where the jury was originally instructed on intoxication and diminished capacity; the jurors returned to the courtroom with questions on intent, premeditation and deliberation, the role of alcohol and the effect of reduction in judgment; the court's reinstruction included an instruction on sanity; defendant was not given an opportunity to object until after the jury retired; defendant then objected on the ground that he had not raised the insanity defense; and defendant contended on appeal that, because the jury was instructed on insanity, for which defendant bears both the burden of production and persuasion, the jury may have also believed defendant bore the burden of persuasion for voluntary intoxication and diminished capacity. The court erred by giving an insanity instruction where there was no evidence of insanity; however this instruction did not relieve the State of its burden of proving every element of the crime charged in that the court repeatedly instructed the jury on the State's burden to prove each element of first-degree murder; the court properly instructed the jury twice on voluntary intoxication and diminished capacity; the instruction on insanity did not inform the jury that defendant had the burden of proof regarding insanity and did not negate the accu-

rate instructions on voluntary intoxication and diminished capacity; and the evidence before the jury supported its verdict.

**Am Jur 2d, Trial §§ 1279, 1280.**

2. **Appeal and Error § 155 (NCI4th)— first-degree murder—instructions—intent to kill—diminished capacity and intoxication—no timely objection**

Defendant waived appellate review of instructions concerning intent to kill and diminished capacity and intoxication where the court asked whether the prosecution or defendant had any requests for additions or modifications to the instructions after the jury retired, defendant did not then object to the instruction at issue, and defendant brought the instruction to the attention of the court when the jury returned for further instruction approximately one and one-half hours later. Defendant did not properly preserve this assignment of error because he did not timely object when the trial court inquired as to whether any party had any objections, and he waived any appellate review because he did not specifically and distinctly allege that the court's instruction amounted to plain error.

**Am Jur 2d, Appeal and Error §§ 562 et seq.**

3. **Homicide § 490 (NCI4th)— first-degree murder—instructions—premeditation—specific intent to kill—deliberation**

The trial court did not err in a first-degree murder prosecution by instructing the jury on premeditation, intent to kill, and deliberation conjointly, rather than separately, when charging with regard to voluntary intoxication and diminished mental capacity. Specific intent to kill, premeditation and deliberation are interdependent rather than independent elements and must be considered collectively rather than in isolation.

**Am Jur 2d, Homicide §§ 482 et seq.**

4. **Homicide § 470 (NCI4th)— first-degree murder—instructions—burden of proof and reasonable doubt**

The trial court did not err in a first-degree murder prosecution by not giving the proffered pattern jury instruction on the burden of proof and reasonable doubt where the trial court charged the jury numerous times throughout its instructions on first-degree murder and second-degree murder that the State bore the burden of proof on each element.

**Am Jur 2d, Homicide §§ 482 et seq.**

STATE v. HAMILTON

[338 N.C. 193 (1994)]

Appeal as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Small, J., at the 5 October 1992 Criminal Session of Superior Court, Orange County, upon a jury verdict finding defendant guilty of first-degree murder and a jury recommendation that defendant be sentenced to life imprisonment. Heard in the Supreme Court 6 December 1993.

*Michael F. Easley, Attorney General, by Valerie B. Spalding, Assistant Attorney General, for the State.*

*J. Kirk Osborn for defendant-appellant.*

MEYER, Justice.

Upon a proper indictment, defendant Ralph Edwin Hamilton was tried capitally, convicted of first-degree murder of his wife, Marva Hamilton, and sentenced to life imprisonment. On appeal defendant brings forth three assignments of error: that the trial court committed reversible error in instructing on sanity and soundness of mind, that the trial court committed reversible error in instructing that intent may be inferred from diminished mental capacity and intoxication, and that the trial court erroneously denied defendant's requested jury charge on the burden of proof. We conclude that defendant's trial was free of prejudicial error and therefore affirm his conviction of first-degree murder.

At trial, the State's evidence tended to show the following:

Around 4:00 p.m. on 2 July 1991, Eric Cherry, a second-shift employee at UNC Hospitals in Chapel Hill, North Carolina, left work and walked toward Parking Lot F at the Dean E. Smith Center. Cherry entered his vehicle and began backing out of the parking space when he heard a popping noise. Believing that one of his tires had burst, Cherry drove forward to see if he could determine which tire had malfunctioned. At the same time he heard another popping noise. Convinced that nothing was wrong with his car, he proceeded to drive around the parking lot to determine whose car had malfunctioned. He noticed a man, later identified by Cherry as defendant, standing over a woman, later identified as the victim Marva Hamilton, who was lying face down on the ground. Cherry stopped his car and witnessed defendant raise a gun and fire at the victim's head from a distance of about one foot. Cherry noticed that a grey station wagon was parked directly behind a white truck. The driver's doors of both vehicles

STATE v. HAMILTON

[338 N.C. 193 (1994)]

were open. As Cherry watched, defendant shot the victim three more times. At some point during the shooting defendant stared directly at Cherry. As defendant walked toward the station wagon, Cherry copied down the car's license plate number, then drove away. When he looked back to see where defendant was, Cherry saw him return to the victim's body and shoot her again. Defendant then entered the station wagon and sped out of the parking lot.

Cherry proceeded straight to the police station where he talked with an officer and followed him back to the crime scene. Cherry had seen the victim before and knew that the white truck was the vehicle she usually drove.

Denise Johnson, who was employed by UNC Hospitals on 2 July 1991 in the same department as the victim, was returning to her car in Parking Lot F around 4:00 p.m. Upon reaching the parking lot, she saw somebody struggling and then heard a noise similar to a car back-firing. She looked around and saw people diving for cover on the steps leading down to the parking lot. Upon hearing more shots, she hid beneath a car. Looking under the cars, she could see someone's feet in a position indicating a body was prone on the ground. Johnson heard someone drive away and then return, followed by additional gunfire. After the car drove away a second time, Johnson approached the feet and found the victim on the ground, with a pool of blood behind her head. The victim had a weak pulse and her eyes were dilated. Her car keys were at her side. Johnson immediately yelled for help.

Deborah Ware, a UNC Hospitals employee, was entering the parking lot at the time of the shooting. She heard a shot and witnessed a man standing over a person and pointing a gun at the person's head. Ruthanne Wheeler, a registered nurse at the hospital, was also returning to the parking lot at the time of the shooting. Upon entering the lot, she heard someone yell for a doctor or nurse. Wheeler went to the victim and attempted to perform mouth-to-mouth resuscitation. There was a considerable amount of blood and an apparent wound to the victim's head. Elizabeth Nicotra, a registered nurse who was accompanying Wheeler, assisted in rendering first aid. During a search for some identification, Nicotra found the victim's purse in the truck. She also discovered that the truck's right rear tire was flat.

Rodney Carter, criminal investigator with the UNC Department of Public Safety, arrived at the crime scene at 4:37 p.m. He found the driver's door of the victim's truck open. Inside the truck were book-

STATE v. HAMILTON

[338 N.C. 193 (1994)]

bags, keys and a hospital pager. The truck's right rear wheel was flat. The wheel was later checked for punctures and found to have none. Carter recovered two bullets from the asphalt beneath the victim's body. He also recovered bullet fragments from the hospital following the victim's autopsy. During a subsequent search of defendant's car, he recovered one unfired .22-caliber bullet and three .22-caliber casings. Subsequent examination of these items at the SBI laboratory revealed that all of the recovered casings were fired from the same .22-caliber gun. Furthermore, a projectile recovered from the victim's brain was identified as a .22-caliber bullet.

An autopsy of the victim revealed two gunshot wounds to the head, either of which was potentially fatal, as well as bruises and abrasions on the head. The autopsy further revealed gunshot wounds to the victim's hands, which according to forensic pathology expert Deborah L. Radisch, M.D., appeared defensive in nature.

At the time of the shooting, Hildegarde ("Peggy") Slade lived at Tar Heel Manor, an apartment complex in Carrboro. She was familiar with defendant because he had been living in the same complex with the victim and their daughter. Several days before the shooting, Peggy saw the victim at the apartment complex retrieving clothes for the children.

After the victim and defendant separated, defendant visited Peggy's apartment daily. Peggy noticed defendant had a drinking problem and had persuaded defendant to attend Alcoholics Anonymous.

On 2 July 1991, defendant called Peggy to inform her he was coming to town from Greensboro. He arrived at her apartment around 9:00 a.m. with a twelve-pack of beer. While at the apartment, defendant consumed eight beers. Defendant began speaking of the victim and of how he wanted her to return. As the morning progressed, Peggy noticed defendant becoming angry. Defendant indicated that he thought the victim was having a relationship with a man named George. At Peggy's suggestion, defendant went to his own apartment around noon. Around 3:00 p.m. on the same day, Peggy saw defendant putting clothes into his grey station wagon. Defendant informed her that he was going to Greensboro and that she would not see him again.

Thomas Slade was a fishing companion of defendant. Around 4:45 p.m. on 2 July 1991, Thomas returned home from work. At about 5:10

p.m. he received a collect telephone call from defendant in Greensboro. Defendant informed Thomas that he had just shot his wife four or five times and that he needed Thomas to call the hospital to determine her condition. Defendant gave him a number to call in Greensboro and said that he was planning to go to Georgia.

Upon telephoning the hospital, Thomas was given no information about the victim's condition but was asked to contact the victim's family as quickly as possible. Thomas was able to reach one of the victim's brothers; however, there was no answer at the number given to him by defendant. On the same evening, defendant telephoned William Mack in Greensboro and informed him he had shot his wife. At defendant's direction, Mack called the hospital and discovered the victim was in critical condition. Mack asked defendant to come to his house and defendant complied. When defendant arrived, Mack said that he appeared "out of it" and was crying. Defendant told Mack that he went to the parking lot to talk to the victim. When he approached the victim, she reached into the truck and defendant thought she was retrieving a gun. In reaction, defendant started shooting. Mack called the 911 emergency number in Guilford County to divulge defendant's location. When defendant said that he was not going to wait for the police to arrive, Mack called 911 a second time. Shortly thereafter, police officers arrived at Mack's home and took defendant to the Greensboro Police Department.

Detective Clay Williams of the UNC police took defendant into custody at the Greensboro Police Department and transported him to Chapel Hill. At the time of arrest, defendant smelled strongly of alcohol. When Williams attempted to read the arrest warrant to defendant, defendant passed out. Williams determined that defendant's condition rendered him incapable of understanding his rights under *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966). Upon arrival in Chapel Hill, Williams discovered that the victim had died. When Williams informed defendant of the victim's death, defendant fainted.

Evelyn Hamilton, defendant's sister, testified that defendant called her around 10:00 p.m. on 1 July 1991. Defendant informed Evelyn Hamilton that he needed the gun he had recently given her because he was scared that his wife's brothers were going to do something to him. Evelyn Hamilton informed defendant that she no longer had the gun.

Defendant presented the following evidence:

Billy Williamson Royal, M.D., a forensic psychiatrist accepted as an expert in his field, testified that he conducted three interviews with defendant in September 1992 and October 1992. He also had examined various documents pertaining to defendant's school record, his treatment at Dorothea Dix Hospital and records of his attorney's interviews with members of his family. Based on his examination, Royal made several diagnoses with regard to defendant's mental state on 2 July 1991. Royal diagnosed defendant's condition as one of acute alcohol intoxication, alcohol dependency, depression, personality disorder not otherwise specified, identity disorder and a provisional diagnosis of cocaine use. In Royal's opinion, defendant did not have the capacity in terms of a normal person to form the intent to murder his wife at the time of the shooting. Royal also was of the opinion that on 2 July 1991 defendant was unable to carry out plans in terms of a normal, reasonable person.

Jacqueline Bradsher, a jail matron at the Orange County Sheriff's Department, testified that she had seen defendant at the jail on 2 July and on 3 July 1991. Bradsher testified she heard defendant call out to his wife during the night. She also heard him ask other jailers whether he could use the telephone to call his wife so that she could post bond for him.

On rebuttal, the State called James Groce, M.D., who was accepted as an expert in the field of forensic psychiatry. Groce had examined defendant twice, on 5 July and 6 July 1991, after his admission to Dorothea Dix Hospital on 5 July 1991. Groce also conducted interviews of defendant on 8 July, 10 July, 14 July and 17 July. He diagnosed defendant as suffering from an adjustment disorder with depressed mood and alcohol dependence. Groce further noted the possibility of alcohol withdrawal. In Groce's opinion, defendant, on 2 July 1991, would have been able to understand the situation, evaluate what was happening, make plans for future behavior and form the intent to carry out actions. Groce was of the opinion that defendant would have been able to understand what was going on and, based on this understanding, make plans for new behavior. Groce again examined defendant on 17 September 1991 during a subsequent admission to Dorothea Dix Hospital and diagnosed defendant as suffering from adjustment disorder with depressed mood, a condition which typically lasts for three months but probably was prolonged in part because of the impending trial and death of his wife.

I.

[1]    Defendant first contends the trial court committed reversible error by instructing the jury that "sanity or soundness of mind is the natural and normal condition of people." Defendant contends that by instructing the jury on insanity, for which defendant bears both the burden of production and persuasion, the jury may have also erroneously believed defendant bore the burden of persuasion for the defenses of voluntary intoxication and diminished capacity. We disagree.

The record indicates that in its original charge, the trial court instructed the jury as follows:

> And fifth, the State must prove the defendant acted with deliberation, which means that he acted while he was in a cool state of mind. This does not mean that there had to be a total absence of passion or emotion. If the intent to kill was formed with a fixed purpose, not under the influence of some suddenly aroused violent passion, it is immaterial that the defendant was in a state of passion or excited when the intent was carried into effect. In determining this, you will consider the defendant's intoxication and diminished mental capacity, if any, as I will explain to you later.
>
> . . . .
>
> You may find that there is evidence which tends to show that the defendant was intoxicated or was impaired by a mental or emotional disorder at the time of the shooting.
>
> . . . If the defendant was intoxicated or his mental capacity was diminished as a result of mental or emotional impairment, you should consider whether or not any one of these or all of these conditions affected his ability to formulate the specific intent which is required for a conviction of first degree murder.
>
> . . . .
>
> . . . If as a result of intoxication or diminished mental capacity by reason of mental or emotional impairment, the defendant did not have the specific intent to kill formed after premeditation and deliberation, he is not guilty of first degree murder.
>
> Therefore, I instruct you, if you have a reasonable doubt as to whether or not the defendant formulated the specific intent to kill

after premeditation and deliberation, considering the evidence with respect to defendant's intoxication and diminished mental capacity as a result of mental or emotional impairment, you will not return a verdict of guilty of first degree murder.

After being so instructed, the jury retired to the jury room for deliberation. Within one and one-half hours, the jury returned to the courtroom with questions on several matters for the trial court, including the instructions on "intent," "premeditation" and "deliberation." The jury was "particularly concerned about what role judgment would play in the ability to deliberate or to plan or to premeditate, and whether alcohol and some reduction in judgment in that faculty would mean that an individual is unable to premeditate or deliberate." The trial court then consulted with the prosecution and defense counsel, at which time defense counsel expressed concern with the trial court's original instruction on intent, describing it as "somewhat confusing." The trial court stated that it would "endeavor to clarify" the matter and then reinstructed the jury on the elements of first-degree murder as follows:

The third thing the State must prove is that the defendant intended to kill the victim. . . .

In your consideration of whether or not the defendant had this intent to kill, I would instruct you that you should consider the defendant's condition as a result of intoxication, if any, and any diminished mental capacity he may have had as a result of a mental defect or emotional disturbance.

I'll go into that a little bit further later on. But I am varying this instruction and the following instructions from what I gave you this morning.

Fourth, the State must prove the defendant acted with premeditation. . . .

In your consideration of this element, I would instruct you that you should consider the degree of defendant's intoxication, if any, and any diminished mental capacity as a result of emotional or mental disturbance or defect. And I'll explain that, as I said, further later.

And fifth, the State must prove the defendant acted with deliberation. . . .

In determining whether or not the defendant acted with deliberation, again you would consider in your determination of this

**STATE v. HAMILTON**

[338 N.C. 193 (1994)]

element the defendant's degree of intoxication, if any, and any diminished mental capacity as a result of mental defect or emotion.

You may find that there is evidence which tends to show that the defendant had been drinking and was intoxicated, or that he was impaired by a mental or emotional disorder at the time of the shooting. In this connection I would instruct you—I just want to check one thing.

(Pause in the proceedings.)

THE COURT: Excuse me. *I would instruct you that sanity or soundness of mind is the natural and normal condition of people. Therefore, everyone is presumed to be sane until the contrary is made to appear. And so I would instruct you that a person is presumed to have normal mental capacity and emotions until the contrary is shown.*

Also, I would instruct you that generally, voluntary intoxication is not a legal excuse for a crime.

In this case, there was evidence of intoxication or of some degree of intoxication, and there was evidence of some mental impairment as a result of emotion or mental disorder. Therefore, you must determine the effect either one or the combination of those conditions had upon the defendant's ability to premeditate, deliberate, and to have the active—the actual, specific intent to kill.

. . . .

It is not a fact that I can relate to you as to what effect the alcohol would have on his judgment, or what role alcohol or his emotional or mental state would have on his premeditation or deliberation or on his intent to kill. That is a fact the jury must determine from the evidence.

If the defendant was intoxicated or his mental capacity was diminished as a result of mental or emotional impairment, you should consider whether or not any one of these or a combination of these conditions affected his ability to formulate the specific intent which is required for a conviction of first degree murder.

. . . .

If as a result of intoxication or diminished mental capacity by reason of mental or emotional impairment, the defendant did not have the specific intent to kill formed after premeditation and deliberation, he is not guilty of first degree murder.

Therefore, I instruct you, if you have a reasonable doubt as to whether or not the defendant formulated the specific intent to kill after premeditation and deliberation, considering the evidence with respect to the defendant's intoxication and diminished mental capacity as a result of mental or emotional impairment, you will not return a verdict of first degree—guilty of first degree murder.

(Emphasis added.)

Having been so instructed, the jury once again retired to the jury room to resume deliberation. Defendant subsequently objected to the instruction relating to sanity or soundness of mind on the ground that defendant had not raised the insanity defense.

We conclude, and the State concedes, that because an instruction on insanity given by the trial court is inapplicable where there is no evidence of insanity, it was error for the trial court to give such an instruction. *State v. Jones*, 293 N.C. 413, 426, 238 S.E.2d 482, 490 (1977); *see also State v. Buchanan*, 287 N.C. 408, 215 S.E.2d 80 (1975). This erroneous instruction, however, does not require reversal.

Rule 10(b)(2) of the North Carolina Rules of Appellate Procedure provides:

*Jury Instructions; Findings and Conclusions of Judge.* A party may not assign as error any portion of the jury charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly that to which he objects and the grounds of his objection; provided, that opportunity was given to the party to make the objection out of the hearing of the jury, and, on request of any party, out of the presence of the jury.

N.C. R. App. P. 10(b)(2). While defendant did object to the instruction on insanity, no objection was made until after the jury had retired for deliberation. However, a review of the transcript shows that defense counsel was not given, as required by Rule 10(b)(2), an opportunity to make an objection regarding the trial court's instruction on sanity and soundness of mind until after the jury had retired to resume deliberation. Therefore, we will treat this assignment of error as if it

had been properly preserved for appellate review and will review it for error.

Defendant has the burden of both production and persuasion when pleading the defense of insanity. *State v. Thompson*, 328 N.C. 477, 402 S.E.2d 386 (1991). However, when pleading the defense of voluntary intoxication or diminished mental capacity, defendant has only the burden of production. *State v. Mash*, 323 N.C. 339, 372 S.E.2d 532 (1988) (voluntary intoxication); *State v. Rose*, 323 N.C. 455, 373 S.E.2d 426 (1988) (diminished mental capacity). Defendant contends the trial court's erroneous instruction on insanity or soundness of mind had the effect of shifting the burden of persuasion to defendant on the defenses of voluntary intoxication and diminished mental capacity and, therefore, was unconstitutional. Defendant fails to articulate which of his constitutional rights were violated; however, we presume his contention is that the erroneous instruction had the effect of relieving the State of its burden of proof, thereby violating due process. *Sandstrom v. Montana*, 442 U.S. 510, 61 L. Ed. 2d 39 (1979). Because the error allegedly was of constitutional dimension, defendant contends that the burden is on the State, pursuant to N.C.G.S. § 15A-1443(b), to prove that the trial court's error was harmless beyond a reasonable doubt.

We conclude that the trial court's instruction on sanity or soundness of mind did not relieve the State of its burden of proving, beyond a reasonable doubt, every element of the crime charged. For this reason, the trial court's instruction did not violate defendant's due process rights, *In re Winship*, 397 U.S. 358, 25 L. Ed. 2d 368 (1970), and "the harmless error standard of N.C.G.S. § 15A-1443(a) applies," *State v. Hood*, 332 N.C. 611, 617, 422 S.E.2d 679, 682 (1992), *cert. denied*, ___ U.S. ___, 123 L. Ed. 2d 659 (1993). Under N.C.G.S. § 15A-1443(a), defendant "bears the burden of showing a reasonable possibility that, absent the error, a different result would have been reached at trial." *Id.* We hold that defendant has not met this burden.

The record indicates that the trial court not only repeatedly instructed the jury on the State's burden to prove each element of first-degree murder, it also properly instructed the jury twice on voluntary intoxication and diminished capacity. The trial court charged the jury not to return a verdict of guilty of first-degree murder if it had a reasonable doubt as to whether defendant was able to formulate the specific intent to kill after premeditation and deliberation in light of the evidence of defendant's intoxication and diminished mental

capacity. Nothing in these instructions placed any burden on defendant to prove intoxication or diminished capacity beyond a reasonable doubt. Rather, the jury was properly charged to consider whether there was sufficient evidence of either voluntary intoxication or diminished capacity so as to raise a reasonable doubt as to the existence of the intent required for a conviction of first-degree murder.

As to the trial court's isolated instruction on sanity or soundness of mind, this instruction, while erroneous, did not inform the jury that defendant had the burden of proof regarding insanity. Nor did it negate the trial court's repeated, accurate instructions on voluntary intoxication and diminished capacity. "We presume 'that jurors . . . attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them.'" *State v. Jennings*, 333 N.C. 579, 618, 430 S.E.2d 188, 208 (quoting *Francis v. Franklin*, 471 U.S. 307, 324 n.9, 85 L. Ed. 2d 344, 360 n.9 (1985)) (alteration in original), *cert. denied*, —— U.S. ——, 126 L. Ed. 2d 602 (1993).

We further conclude that the evidence before the jury supported its verdict. At trial, defense counsel conceded that defendant killed the victim, stating: "Sometime around 4 o'clock or a little later that evening, [defendant] did shoot and kill his wife in the parking lot at UNC. We don't dispute that." The only question before the jury, therefore, was whether defendant was guilty of first- or second-degree murder, the resolution of which hinged largely on how the jury considered evidence of defendant's intoxication and diminished capacity. We conclude there was substantial evidence from which the jury could have found beyond a reasonable doubt that defendant did not act while voluntarily intoxicated or while under a diminished capacity. With regard to voluntary intoxication, there was some evidence in the record that defendant had been intoxicated in the past. However, there was no evidence that defendant had consumed any alcoholic beverages between midday and approximately 4:00 p.m., the time at which the murder was committed. Following the murder, defendant successfully drove his vehicle from Chapel Hill to Greensboro. Although he was intoxicated at the time of arrest, approximately three hours had elapsed since the time of the shooting.

As for the defense of diminished capacity, defendant offered psychiatric testimony of Dr. Royal, a forensic psychiatrist. Dr. Royal based his opinion on examinations made approximately one year after the murder. Dr. Royal had no knowledge of defendant's dimin-

ished capacity at the time of the victim's death. Conversely, State's witness Dr. Groce, a forensic psychiatrist who treated defendant upon his admission to Dorothea Dix Hospital three days after the murder, testified that while defendant was suffering from an adjustment disorder with depressed mood and alcohol dependence, he was of the opinion that at the time of the murder, defendant could have made plans and would have been able to form the intent to carry out plans.

Furthermore, an examination of the record reveals plenary evidence of premeditation and deliberation. For purposes of proving the elements of first-degree murder,

> [a] killing is "premeditated" if "the defendant formed the specific intent to kill the victim some period of time, however short, before the actual killing." A killing is "deliberate" if the defendant acted "in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation."

*State v. Morston*, 336 N.C. 381, 402, 445 S.E.2d 1, 13 (1994) (quoting *State v. Bonney*, 329 N.C. 61, 77, 405 S.E.2d 145, 154 (1991)). Premeditation and deliberation ordinarily are not susceptible to proof by direct evidence; therefore, they generally must be proved by circumstantial evidence, such as,

> "(1) want of provocation on the part of the deceased, (2) conduct and statements of the defendant before and after the killing, (3) threats made against the victim by defendant, (4) ill will or previous difficulty between the parties, and (5) evidence that the killing was done in a brutal manner."

*State v. Woodard*, 324 N.C. 227, 231, 376 S.E.2d 753, 755 (1989) (quoting *State v. Calloway*, 305 N.C. 747, 751, 291 S.E.2d 622, 625-26 (1982)).

Here the evidence shows that prior to the murder, defendant was angry with the victim and informed Peggy Slade that he believed the victim was seeing another man. On the day before the murder, defendant attempted to retrieve a gun from his sister under the pretext that he was scared of the victim's brothers and needed protection. He also informed a co-worker that he was moving to Greensboro and would not be returning to work. On the day of the murder, defendant packed his car and informed a neighbor that he was leav-

ing town permanently. Defendant went to the parking lot where the victim parked her car while working and shot the victim multiple times as she attempted to leave work. After the shooting, the victim was lying face down on the ground. Defendant began to walk away, but returned to the victim and, while standing over her body, fired an additional shot at her head from close range. Defendant then left the parking lot quickly in his car and proceeded to leave town.

This assignment of error is overruled.

II.

[2] By his next assignment of error, defendant contends the trial court erred by instructing the jury that intent to kill may be inferred from diminished mental capacity and intoxication. During its initial charge to the jury on the elements of first-degree murder, the trial court instructed the jury as follows:

> Third, the State must prove the defendant intended to kill the victim. Intent is a mental attitude seldom provable by direct evidence. It must ordinarily be proved by circumstances from which it may be inferred. An intent to kill may be inferred from the nature of the assault, the manner in which it was made, the conduct of the parties, and other relevant circumstances, including intoxication and the defendant's mental—excuse me—and the defendant's diminished mental capacity, if any, as I will explain to you later.

After the jury retired to the jury room, the trial court asked whether the prosecution or defendant had any requests for additions or modifications to the instructions. At that time, defendant did not object to the instruction at issue. It was not until approximately one and one-half hours later, when the jury returned from deliberation for further instruction, that defendant brought the instruction to the attention of the trial court. At that point, defendant stated that the instruction was "somewhat confusing," and the trial court advised that it would "endeavor to clarify" the matter. The trial court then reinstructed the jury that with regard to the elements of first-degree murder, "[a]n intent to kill may be inferred from the nature of the assault, the manner in which it was made, the conduct of the parties, and other relevant circumstances." With regard to each element of first-degree murder, the trial court instructed the jury that it should "consider the defendant's condition as a result of intoxication, if any, and any diminished mental capacity he may have had as a result of a

mental defect or emotional disturbance." The trial court further charged that defendant could not be found guilty of first-degree murder "[i]f as a result of intoxication or diminished mental capacity by reason of mental or emotional impairment, the defendant did not have the specific intent to kill formed after premeditation and deliberation."

Because defendant did not timely object to the trial court's instructions when the trial court, outside the presence of the jury, inquired as to whether either party had any objections with regard to the jury charge, defendant did not properly preserve this assignment of error for appellate review under Rule 10(b)(2) of the Rules of Appellate Procedure. Rule 10(c)(4) provides:

> *Assigning Plain Error.* In criminal cases, a question which was not preserved by objection noted at trial and which is not deemed preserved by rule or law without any such action, nevertheless may be made the basis of an assignment of error *where the judicial action questioned is specifically and distinctly contended to amount to plain error.*

N.C. R. App. P. 10(c)(4) (emphasis added). Because defendant has failed to specifically and distinctly allege that the trial court's instruction amounted to plain error, defendant has waived any appellate review.

This assignment of error is overruled.

## III.

**[3]** By another assignment of error, defendant contends that the trial court erred by not charging the jury as defendant requested with regard to premeditation, specific intent to kill and deliberation. Defendant made a timely written request for separate instructions as to the impact of voluntary intoxication and diminished capacity upon premeditation, deliberation and intent to kill. Defendant requested that the trial court instruct the jury in three separate instructions on how voluntary intoxication or diminished mental capacity may have affected defendant's ability to act with intent to kill, premeditation or deliberation. Concerned that defendant's proffered instruction would result in confusion for the jury, the trial court denied defendant's request. The trial court instead combined the elements of first-degree murder when instructing the jury on voluntary intoxication and diminished capacity and gave the following charge: "If as a result of intoxication or diminished mental capacity by reason of mental or

emotional impairment, the defendant did not have the specific intent to kill formed after premeditation and deliberation, he is not guilty of first degree murder."

Defendant contends that had the trial court instructed the jury separately regarding the impact of voluntary intoxication and diminished capacity on premeditation and on deliberation, a different result would have been reached. We do not agree.

This Court addressed a similar issue in *State v. Holder*, 331 N.C. 462, 418 S.E.2d 197 (1992). There, the defendant requested that the trial court instruct the jury on whether his alleged diminished capacity affected his capacity to form the requisite intent for first-degree murder as well as his capacity to premeditate and deliberate. The trial court, upon agreeing to give the requested instruction in substance, charged the jury as follows: "If, as a result of the combined intoxicated, drugged and lacking mental capacity of the defendant, if, as a result of this, the defendant did not have the specific intent to kill the deceased formed after premeditation and deliberation, then he is not guilty of first degree murder." *Id.* at 474, 418 S.E.2d at 203. The defendant argued that since intent is an element independent of premeditation and deliberation, he was entitled to have a separate diminished capacity instruction with regard to each element.

Holding to the contrary, this Court noted that "specific intent to kill is a necessary element of first-degree murder," and proof of premeditation and deliberation is also proof of intent to kill. *Id.* Therefore, "specific intent is a constituent of premeditation and deliberation." *Id.* at 475, 418 S.E.2d at 204; *see also State v. Quesinberry*, 319 N.C. 228, 230, 354 S.E.2d 446 448 (1987).

The *Holder* Court based its conclusion on the language attending the substantive elements of first-degree murder, which provides:

> "*Premeditation means that the defendant formed the specific intent to kill* for some length of time, however short, before the actual killing. *Deliberation means that the intent to kill* was executed in a cool state of blood, without legal provocation, and in furtherance of a fixed design for revenge or to accomplish some unlawful purpose. No particular length of time is required for the mental processes of premeditation and deliberation; it is sufficient that the processes occur prior to, and not simultaneously with, the killing."

331 N.C. at 475, 418 S.E.2d at 204 (quoting *State v. Cummings*, 323 N.C. 181, 188, 372 S.E.2d 541, 547 (1988) (citations omitted), *sentence vacated on other grounds*, 494 U.S. 1021, 108 L. Ed. 2d 602 (1990), *on remand*, 329 N.C. 249, 404 S.E.2d 849 (1991)) (emphasis added). This language demonstrates that a specific intent to kill is a constituent of both premeditation and deliberation. As such, specific intent to kill, premeditation and deliberation are interdependent, rather than independent, elements and must be considered collectively rather than in isolation. Following the lead of *Holder*, we conclude it was not error for the trial court to instruct the jury on these elements conjointly, rather than separately, when charging the jury with regard to voluntary intoxication and diminished mental capacity.

[4] Defendant further contends the trial court erred by not giving the proffered pattern jury instruction on the burden of proof and reasonable doubt, which provides:

> The defendant has entered a plea of "not guilty." The fact that he has been [indicted] [charged] is no evidence of guilt. Under our system of justice, when a defendant pleads "not guilty," he is not required to prove his innocence; he is presumed to be innocent. The State must prove to you that the defendant is guilty beyond a reasonable doubt.

N.C.P.I.—Crim. 101.10 (1974). The trial court denied defendant's request and instead instructed the jury as follows:

> Under our system of justice, when a defendant pleads not guilty, he is not required to prove his innocence. The defendant is presumed to be innocent. That presumption goes with him throughout the trial, and until the jury is satisfied of his guilt beyond a reasonable doubt.

Defendant asserts that by failing to give the requested instruction, the trial court failed to explain to the jury that the State bears the burden of proof throughout the trial. We note, and defendant concedes, that the trial court charged the jury numerous times throughout its instructions on first-degree murder and second-degree murder that the State bore the burden of proof on each element. We therefore find no error.

For the foregoing reasons, we hold defendant received a fair trial free of any prejudicial error.

NO ERROR.