STATE OF NORTH CAROLINA v. ABDULLAH EL-AMIN SHAREEF

No. COA11-822

(Filed 19 June 2012)

1. **Homicide—first-degree murder—attempted first-degree murder—felony assault—felony murder—motion to dismiss—sufficiency of evidence—specific intent—diminished capacity—mental illness—harmless error**

    The trial court did not err by denying defendant's motion to dismiss the charges based on the State's alleged failure to present sufficient evidence that defendant had the necessary specific intent for premeditated murder, attempted first-degree murder, and felony assault. Although defendant presented substantial evidence of diminished capacity, the fact that death was a natural consequence of repeatedly running over a person with a van or truck and the circumstances surrounding the assaults and murder were such that a jury could reasonably find that defendant, despite his mental illness, intended to kill his victims. Any error in the submission of felony murder to the jury was harmless when the first-degree murder conviction based on premeditation and deliberation was upheld.

**2. Evidence—failure to admit testimony—defendant's behavior five years later—probative value outweighed by undue prejudice**

The trial court did not abuse its discretion by refusing to admit testimony from two county detention center employees describing defendant's behavior in 2009. Defendant presented voluminous expert and family testimony, as well as the testimony of a judge, relating to the actual time frame at issue. Given that evidence, the trial court could have reasonably determined that the probative value of evidence from lay witnesses regarding behaviors in 2009, five years after the events in this case, was substantially outweighed by the potential for jury confusion and undue prejudice.

Appeal by defendant from judgments entered 23 March 2010 by Judge James F. Ammons, Jr. in Cumberland County Superior Court. Heard in the Court of Appeals 14 December 2011.

*Attorney General Roy Cooper, by Special Deputy Attorney General G. Patrick Murphy, for the State.*

*Glenn Gerding for defendant-appellant.*

GEER, Judge.

Defendant Abdullah El-Amin Shareef appeals from his convictions of first degree murder, two counts of attempted first degree murder, two counts of assault with a deadly weapon with intent to kill inflicting serious injury ("AWDWIKISI"), misdemeanor assault with a deadly weapon, and two counts of felony larceny. Defendant primarily argues on appeal that his motion to dismiss should have been granted as to the specific intent crimes based on his diminished capacity. Because we find the State presented sufficient evidence from which a reasonable juror could find defendant had the specific intent to kill, defendant's motion to dismiss was properly denied.

## Facts

The State's evidence at trial tended to show the following facts. On the morning of 14 April 2004 at about 7:45 a.m., defendant stole a white City of Fayetteville work van. David McCaskill was walking his dogs and noticed a white van proceeding in the opposite direction. The driver turned around and accelerated straight at Mr. McCaskill. Although Mr. McCaskill tried to get out of the way, defendant hit Mr. McCaskill with the left side of the van and, as he fell, the back tire of the van ran over his right foot.

Defendant then slammed on the brakes and backed up toward Mr. McCaskill. Mr. McCaskill pulled himself up a small hill to avoid being run over again. When defendant could not drive up the hill, he got out of the van and began stabbing Mr. McCaskill in the head and face with what appeared to be pencils. After defendant returned to the van and appeared to be looking for something to beat him with, Mr. McCaskill screamed for help. Defendant drove off when he saw a man come out of a house across the street. The resident confirmed that the van was a City of Fayetteville vehicle and gave the license plate number to police. Mr. McCaskill was stabbed eight to 10 times, and the bones in his lower right leg were crushed.

Defendant drove a short distance to the corner of Ramsey Street and Summerchase Drive. Gary Weller, a retired head football coach for Pine Forest High School, had dropped his car off at an auto repair shop and decided to jog home. When Mr. Weller paused on the corner of Summerchase Drive, he saw a city van making a three point turn so that it was going in the same direction Mr. Weller was headed. Mr. Weller started to cross the road, but was struck by defendant from behind and was dragged under the van.

Mr. Weller did not know how far he was dragged before the van stopped and went into reverse, flipping Mr. Weller over underneath the van. He had tire marks across his clothing in the chest area. The van then took off, leaving Mr. Weller where he could hear but not see. Mr. Weller lost consciousness and remained unconscious for the next 35 days in the ICU. Mr. Weller suffered a broken sternum, a collapsed lung, had all his ribs fractured, and had significant trauma to his head. His hip joints were knocked through the back of his pelvis, his pelvis was shattered, and he had a double compound fracture of his right tibia and fibula.

At approximately 8:20 a.m., defendant drove north into another neighborhood. He pulled into the driveway of Stacia Bill and Robert Fortier. Mr. Fortier told Ms. Bill that he would talk to the driver of the City of Fayetteville van, and Ms. Bill went inside to retrieve Mr. Fortier's lunch. When she came back outside, Mr. Fortier told her that he had been run over and asked her to call for help. The van accelerated toward the front porch where Mr. Fortier was waiting for emergency personnel. When Ms. Bill went to assist him, the van diverted to the street. As the van left, it hit a tree and a mail box.

Defendant next drove up behind Lonel Bass, who had pulled up to the gate of a "fox pen" that he and other men used for hunting.

STATE v. SHAREEF

[221 N.C. App. 285 (2012)]

Defendant asked Mr. Bass how to get to Fayetteville. As Mr. Bass walked toward the van, defendant ran over him, pinning Mr. Bass underneath the van with his abdominal area up against the stump of a large tree. When the van became stuck on the stump and would not move, defendant drove off in Mr. Bass' white truck.

Just down the road from the fox pen, Seth Thompson was waiting at the home of his in-laws to supervise workers who were scheduled to bury a gas tank. Mr. Thompson was exercising dogs when he saw a white pickup truck come into the driveway. At that point, the truck was approximately 200 yards away. Mr. Thompson then heard a honk and saw that the truck had moved 40 yards closer. He put the dogs back in the kennel, and turned around to find the truck only 50 to 60 feet from him.

Mr. Thompson walked toward the truck to see what was going on. When he was in front of the truck, defendant "floored it," hitting Mr. Thompson and dragging him 40 to 45 feet. The right front truck tire pinned Mr. Thompson's left arm under the vehicle. When Mr. Thompson was able to free his arm and confronted defendant, defendant reached for something. Mr. Thompson, believing defendant might have a weapon or was attempting to put the truck in gear, ran for his own truck.

Mr. Thompson drove away from the residence with defendant following him. Because he recognized the truck defendant was driving as belonging to Mr. Bass, Mr. Thompson notified the authorities. After a brief stop, Mr. Thompson chased defendant for about four minutes while also on the phone with a 911 operator. During the chase, Mr. Thompson was driving as fast as 90 miles per hour in order to keep up with defendant. After losing sight of defendant, Mr. Thompson went to the Erwin Police Department and reported the incident. Mr. Thompson was then taken to the hospital. He suffered abrasions covering essentially his whole face, a tire burn on his left arm, a cut on his leg just below the knee which required stitches, and back injuries.

As a result of Mr. Thompson's call, Mr. Bass was found by officers. They attempted to get the van off of Mr. Bass but were unable to do so. Mr. Bass was obviously in severe pain. It took approximately 30 minutes from the time they found Mr. Bass until rescue personnel arrived with equipment to remove him from under the van. Mr. Bass died before reaching the hospital.

In the meantime, defendant continued north in Mr. Bass' truck until he slammed into the rear of another vehicle outside Fuquay-

Varina. Defendant abandoned the truck and attempted unsuccessfully to enter two other cars, but the drivers kept him from doing so. Defendant then continued running down the middle of the road wearing only socks, a T-shirt, and boxer shorts. Emergency personnel cornered defendant, but when they attempted to arrest him, he ran into a wooded area where he was eventually captured.

Defendant was indicted for one count of first degree murder, three counts of attempted first degree murder, two counts of assault with a deadly weapon with intent to kill inflicting serious injury, one count of assault with a deadly weapon with intent to kill, two counts of felony larceny, and two counts of possession of a stolen motor vehicle. Defendant was tried capitally.

Defendant asserted an insanity defense and argued diminished capacity. Defendant's evidence tended to show that he had been severely stressed financially, ultimately losing his home in foreclosure. Beginning in August 2002, his family noticed a change in his personality. He became confrontational and physically abusive, even hitting his wife and choking his son. Defendant also spent hours smoking marijuana in his garage.

After his father had a heart attack, defendant refused to visit him in the hospital. Defendant cut off all his hair, became very sarcastic, changed the way he dressed, and acted agitated and mean all the time. He refused to take his wife to the doctor when she was sick, and she ultimately was hospitalized for seven days with pneumonia. Defendant acted strangely when visiting his wife in the hospital, including crawling in bed with her, dancing around the room, and acting like a baby. He ate bacon in the hospital cafeteria, which was against his faith as a Muslim. His sister also saw him eating steak and mashed potatoes with his hands in the cafeteria. He would not respond when addressed, and his eyes were bulging and glazed.

On 14 December 2003, while still in the hospital, defendant's wife was told that defendant was being considered for involuntary commitment because of his behavior. Defendant's wife told the hospital authorities that she did not want him committed, explaining that the behavior was because of multiple stressful events going on in his life.

That night, defendant's parents' home was consumed by fire to the point of uninhabitability. Defendant's family believed he intentionally set the fire although he denied it. While escaping the fire, defendant's mother-in-law, who was staying there, turned around and saw defendant holding an oxygen tank as if he was about to hit her in

the back of the head. She attempted to run, but defendant chased her and grabbed her arm. The officer on the scene stopped defendant from hurting his mother-in-law. Defendant's mother, however, was hospitalized due to smoke inhalation during the fire. Defendant's family was told that it was uncertain whether defendant's mother would survive.

Defendant's sister had defendant involuntarily committed on 14 December 2003. He was released on 17 December 2003. Shortly afterward, he appeared unexpectedly at his mother-in-law's house in Roanoke, Virginia where his wife and children were staying. His wife panicked, and her mother called the police. Defendant was charged with trespassing and remained in the Roanoke jail until 9 January 2004. After being released, defendant told his wife that someone from the FBI was following him and that someone was trying to poison him.

Defendant called his father who described the phone call as "an absolutely bizarre conversation." Defendant never asked about his mother's condition. Defendant's mother died of smoke inhalation on 11 January 2004, and defendant did not attend the funeral.

Defendant subsequently was arrested for shoplifting and resisting arrest. At that point, his beard and hair were unkempt, he talked to himself, and he did not always respond when others spoke to him. Defendant told his wife that there had been an earthquake recently in Richmond, and he had caused it. He also claimed he could control the weather, make clouds disappear, and cause it to snow. The house where defendant had been staying had marijuana everywhere, broken glass in the sink, and moldy food in the refrigerator.

When released from jail in March 2004, defendant smelled horrible, got upset that his furniture had been moved into storage, and fled in his wife's car. When his wife regained control of the car, he grabbed her purse and struggled with her. Defendant's wife sought police assistance, and defendant was told to "find another way home."

In mid-March 2004, defendant was found in Wendell lying next to a road. When defendant's father went to get him, defendant was wandering around with bulging eyes and a blank look on his face. His father checked him into two different motels, each of which asked him to leave because of strange behaviors.

A family friend found defendant at this time to be acting paranoid, aggressive, and confrontational and believed he had no rational thought pattern. Defendant's eyes bulged, and it was as if he stared

through people. The family friend and defendant's father took defendant to the Salvation Army to live on 5 April 2004.

When defendant went to register at the Employment Security Commission on 13 April 2004, he had difficulties with his memory and withdrew from the conversation. The next morning, on 14 April 2004, employees of the Salvation Army asked defendant if he was all right because he was acting distant, was not responding to questions, and was looking through people. Shortly thereafter, defendant stole the City of Fayetteville van, and the events giving rise to the prosecution occurred.

Chief District Court Judge Elizabeth Keever presided over defendant's first appearance. She testified that defendant mumbled and looked "scary" with big, unfocused eyes that did not blink. She ordered defendant committed for a mental health evaluation. Defendant was diagnosed as psychotic and tested positive for marijuana. He was admitted to Dorathea Dix Hospital, where he was considered "grossly impaired." Defendant continued to make no eye contact and to mumble; he was nearly catatonic; and he could not follow commands.

Defendant had two expert witnesses testify regarding his diminished capacity and his insanity defense. The first, Dr. Thomas Harbin, was tendered as an expert in the fields of forensic psychology, neuropsychology, and clinical psychology. The second, Dr. George Patrick Corvin, was tendered as an expert in psychiatry and forensic psychiatry. Dr. Harbin first evaluated defendant on 15 April 2004, while Dr. Corvin first evaluated him on 16 April 2004 and again saw him 22 April 2004. Defendant was determined to be incompetent to stand trial and was involuntarily committed.

Dr. Harbin saw defendant again on 7 May 2004 and 31 August 2005. At that point, defendant was medicated, and he was rational and coherent. After administering testing, Dr. Harbin diagnosed defendant with paranoid schizophrenia and concluded that defendant suffered from this condition on 14 April 2004.

Dr. Corvin saw defendant again on 22 September 2005. In that meeting, Dr. Corvin described defendant as "cognitively intact and capable of cooperating." Defendant told Dr. Corvin that he heard God's voice and that he considered this more of a gift than an illness. The medication helped defendant not hear voices, but sometimes he still did. Defendant was on Risperdal and Cogentin at this time. Defendant indicated that he had started hearing the voices shortly after his father had the heart attack. Dr. Corvin visited defendant

again in June 2006. Defendant continued to be "remarkably improved as compared to 2004."

After defendant was found competent to stand trial, he returned to the Cumberland County Detention Center. When Dr. Harbin visited defendant there in June 2009, defendant had detached again from reality, was overly talkative and illogical, had a wide-eyed stare, believed he was God, believed he owned companies such as McDonald's and Reebok, thought that he was telepathing and teleporting, claimed he originated hip hop music and managed the weather, and had a plan to fix the national debt. Dr. Harbin diagnosed defendant as psychotic based on this interaction. Defendant was recommitted to Dorothea Dix Hospital on 15 June 2009.

Dr. Corvin next saw defendant on 5 October 2009 after, as Dr. Corvin testified, defendant had "bargained or came up with a compromise with Doctor Vance to sort of prove that he could be competent and not mentally ill without taking medications; and, so, there was a period of time where he wasn't taking medications, which . . . didn't work out well." While defendant was off his medication, defendant was extremely suspicious, to the point of being belligerent. Dr. Corvin also reported that defendant was "saying bizarre things" with "a lot of religious overtones, grandiosity, having powers that, you know, he didn't have, things of that nature." By 11 January 2010, however, defendant was on a new medication, Zyprexa. While defendant said that he didn't think he needed the medication, he took it "because his doctors felt better when he was taking it." Dr. Corvin saw defendant again on 18 January 2010 and 28 June 2010, but did not note anything in particular.

At trial, Dr. Harbin testified that, in his opinion, on 14 April 2004, defendant "was not able to appreciate the nature of his behavior," and defendant did not know his acts were wrong because of his schizophrenia. Dr. Harbin also had concluded that defendant's ability to "reason, think, plan or carry out a plan or consider the consequences of his actions" was impaired.

Dr. Covin testified that he had diagnosed defendant with paranoid schizophrenia with a second diagnosis of a history of cannabis or marijuana abuse. Dr. Corvin also diagnosed defendant with a personality disorder not otherwise specified with narcissistic features. In his opinion, on 14 April 2004, defendant was suffering from "an acute psychotic episode stemming from an underlying diagnosis of schizophrenia." Dr. Corvin also testified that "on the date in question,

[defendant] was so psychotically impaired that he met the M'Naughton test; and, that, for the acts, which are not in question that he committed, he could not have known that—the nature, quality or, more specifically, the wrongfulness of those behaviors."

The jury convicted defendant of first degree murder based on premeditation and deliberation and felony murder. The jury also convicted defendant of two counts of attempted first degree murder, two counts of assault with a deadly weapon with intent to kill inflicting serious injury, misdemeanor assault with a deadly weapon, two counts of felony larceny, and two counts of possession of a stolen motor vehicle.

During the death penalty sentencing phase of the trial, the jurors unanimously found beyond a reasonable doubt the existence of the aggravating factor that "[t]he murder for which the defendant stands convicted was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons."

The trial court also submitted 31 possible mitigating circumstances to the jury. One or more members of the jury found the following mitigating circumstances by a preponderance of the evidence:

1. The capital felony was committed while [defendant] was under the influence of a mental or emotional disturbance.

   . . . .

2. The capacity of [defendant] to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired.

   . . . .

4. [Defendant] has no significant history of prior criminal activity.

   . . . .

5. [Defendant] graduated from high school and went to college.

   . . . .

9. [Defendant] worked for Sears, in the flea market business with his father and in the real estate business with his wife.

   . . . .

STATE v. SHAREEF

[221 N.C. App. 285 (2012)]

10. [Defendant] and his wife Talethia struggled financially.

. . . .

15. [Defendant's] father, mother and wife were in the hospital at the same time in December 2003.

. . . .

16. [Defendant's] father had a heart attack at Thanksgiving 2003, followed by heart by-pass surgery and now is a diabetic and is on dialysis.

. . . .

17. [Defendant's] mother, Pauline Shareef, was hospitalized in November 2003 and later died of complications from smoke inhalation from the fire at the family home.

. . . .

18. [Defendant] expressed shame and guilt over his mother's death from the fire.

. . . .

23. At the time of the offense, [defendant] was separated from his wife and children.

. . . .

24. [Defendant] has been diagnosed with schizophrenia, which is a permanent mental illness requiring lifelong treatment.

. . . .

25. [Defendant] was homeless at the time of the offense and was staying at the Salvation Army Shelter.

. . . .

26. While at Dix Hospital, [defendant] was part of the Quality Council, organized family day, and was part of the Advocacy Group for other patients.

. . . .

27. [Defendant] participated in programs at Dix Hospital to gain a better understanding of his condition and engage in recovery.

. . . .

29. [Defendant] showed symptoms of schizophrenia for some period of time prior to the offense.

. . . .

30. At the time of the offense, [defendant's] life was in shambles.

The jury, however, found beyond a reasonable doubt that the mitigating circumstances were not sufficient to outweigh the aggravating circumstance. Nonetheless, the jury ultimately found the aggravating circumstance insufficient to call for the imposition of the death penalty. The jury, therefore, unanimously recommended that defendant be sentenced to life imprisonment without parole.

The trial court sentenced defendant to (1) life in prison without parole for the first degree murder of Mr. Bass, (2) two consecutive sentences of 189 to 236 months imprisonment each for the two attempted first degree murders of Mr. Weller and Mr. McCaskill, (3) two consecutive sentences of 100 to 129 months imprisonment each for the two assault with a deadly weapon with intent to kill inflicting serious injury convictions relating to Mr. Weller and Mr. McCaskill, (4) two consecutive sentences of eight to 10 months for the two larcenies of motor vehicles (the City of Fayetteville van and Mr. Bass' truck), and (5) a consecutive 75-day sentence for the misdemeanor assault with a deadly weapon of Mr. Fortier. The trial court arrested judgment with respect to the charges of possession of stolen motor vehicles because possession was an element of the crime of felonious larceny. Defendant timely appealed to this Court.

I

[1] Defendant first contends that the trial court should have granted his motion to dismiss because the State failed to present sufficient evidence that defendant had the necessary specific intent for premeditated murder, attempted first degree murder, and felony assault. Defendant also argues that the trial court erred in denying the motion to dismiss the felony murder charge when the State failed to show that the felonies underlying the charge were part of a continuous chain of events leading up to Mr. Bass' homicide.

"This Court reviews the trial court's denial of a motion to dismiss *de novo.*" *State v. Smith,* 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007). " 'Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included

therein, and (2) of defendant's being the perpetrator of such offense.' " *State v. Lowry*, 198 N.C. App. 457, 465, 679 S.E.2d 865, 870 (2009) (quoting *State v. Powell*, 299 N.C. 95, 98, 261 S.E.2d 114, 117 (1980)). "Substantial evidence is that amount of relevant evidence necessary to persuade a rational juror to accept a conclusion." *State v. Mann*, 355 N.C. 294, 301, 560 S.E.2d 776, 781 (2002). "When reviewing a motion to dismiss based on insufficiency of the evidence, this Court must view the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences." *State v. Bullock*, 178 N.C. App. 460, 466, 631 S.E.2d 868, 873 (2006).

There is no question in this case about defendant's being the perpetrator. Instead, defendant argues that because of his diminished capacity, the State could not prove the specific intent element. As our Supreme Court recently explained, "[t]he diminished capacity defense to first-degree murder on the basis of premeditation and deliberation requires proof of an inability to form the specific intent to kill." *State v. Phillips*, 365 N.C. 103, 140, 711 S.E.2d 122, 148 (2011), *cert. denied*, ___ U.S. ___, 182 L. Ed. 2d 176, 132 S. Ct. 1541 (2012).

However, when a defendant pleads the defense of diminished capacity, "defendant has only the burden of production." *State v. Hamilton*, 338 N.C. 193, 204, 449 S.E.2d 402, 409 (1994). Once a defend-ant comes forward with evidence of diminished capacity, "the jury must decide whether the defendant was able to form the required specific intent." *Phillips*, 365 N.C. at 141, 711 S.E.2d at 149. The burden of persuasion remains on the State to prove defendant's specific intent. *State v. Mash*, 323 N.C. 339, 345, 372 S.E.2d 532, 536 (1988).

In order for the State to meet its burden of proving specific intent, it "must show not only an intentional act by the defendant that caused death, but also that the defendant intended for his action to result in the victim's death." *Phillips*, 365 N.C. at 141, 711 S.E.2d at 149 (internal quotation marks omitted). Our Supreme Court has held that because intent is seldom provable by direct evidence, "the State may rebut a claim of diminished capacity by pointing to actions by a defendant before, during, and after a crime that indicate the existence of, or are consistent with, specific intent." *Id.* It is well established that "[t]he nature of the assault, the manner in which it was made, the weapon, if any, used, and the surrounding circumstances are all matters from which an intent to kill may be inferred. Moreover, an assailant must be held to intend the natural consequences of his deliberate act." *State v. Grigsby*, 351 N.C. 454, 457, 526 S.E.2d 460, 462 (2000) (internal citations and quotation marks omitted).

Here, defendant met his burden of production through multiple witnesses, including Drs. Harbin and Corvin. The burden then shifted to the State to prove defendant's specific intent to kill. The State did not present any expert testimony, but instead, as set forth in *Phillips*, pointed to defendant's acts before, during, and after the crime as showing that defendant had the specific intent to kill necessary for first degree murder based on premeditation and deliberation and the other felony assaults.

The State points out that defendant did not only strike the victims with his vehicle, but also that a jury could conclude that he specifically targeted the victims. He drove slowly ahead of Mr. McCaskill as he walked on the road and then turned around and drove on the wrong side of the street directly towards Mr. McCaskill. Similarly, defendant saw Mr. Weller running down the street and turned around so that he could drive directly at Mr. Weller. With respect to Mr. Bass, after defendant lured him to the front of the van by pretending to need directions to Fayetteville, defendant drove directly at him.

In addition, defendant did not simply hit the victims one time and drive on. After Mr. McCaskill was in effect side-swiped by the van rather than being run over, defendant slammed on the brakes, put the van in reverse, and tried to back over Mr. McCaskill. When Mr. McCaskill pulled himself up a small hill to avoid the van, defendant tried unsuccessfully to drive up the hill and then stabbed Mr. McCaskill, as the victim pleaded, "Why are you trying to kill me?" Likewise, after running over Mr. Weller with the van and dragging him, defendant then put the van in reverse and backed up, further injuring Mr. Weller.

With Mr. Bass, after defendant struck him and drove over him with the van, the van ended up on top of Mr. Bass, pinning him against a large tree stump. The van was then stuck, preventing defendant from reversing, so defendant left it on top of Mr. Bass and drove away in Mr. Bass' truck.

Defendant's actions toward Mr. Fortier and Mr. Thompson provided further evidence of defendant's intent while assaulting his victims with the vehicles. Defendant targeted Mr. Fortier by pulling into his driveway and when Mr. Fortier approached, defendant ran over him. Then, as Mr. Fortier tried to climb onto his front porch, defendant accelerated the van towards the porch, turning aside only when Mr. Fortier's girlfriend came out. With Mr. Thompson, defendant honked the truck to attract Mr. Thompson's attention and, as Mr.

Thompson walked towards him, "floored" the accelerator, running over Mr. Thompson.

A reasonable juror could find from this evidence that defendant picked particular men to run over; drove directly at them or lured them into the direct path of his vehicle; and then tried to run over them not once, but in a manner designed to maximize the damage. With Mr. Weller and Mr. Bass, defendant successfully crushed them, but when defendant's victims were able to evade him to some extent—including Mr. McCaskill, Mr. Fortier, and Mr. Thompson—defendant continued to try to assault the victim until witnesses arrived or, in the case of Mr. Thompson, he was able to escape to his own truck. Defendant sped away from each scene, driving until, as a reasonable juror could find, he identified his next victim.

Although defendant presented substantial evidence of diminished capacity, the fact that death is a natural consequence of repeatedly running over a person with a van or truck and the circumstances surrounding the assaults and murder were such that a jury could reasonably find that defendant, despite his mental illness, intended to kill his victims. *See State v. Morganherring*, 350 N.C. 701, 732-33, 517 S.E.2d 622, 640 (1999) (holding that State, despite diminished capacity defense, presented sufficient evidence of specific intent to kill when after choking and repeatedly stabbing first victim, defendant saw a second woman shortly thereafter, decided to " 'get her,' " tricked her into entering apartment, and then choked her to death); *State v. Lane*, 344 N.C. 618, 621, 476 S.E.2d 325, 327 (1996) (holding that State presented sufficient evidence of premeditated and deliberate intent to kill when defendant, who had a gun, rode bicycle toward victim, saying, " 'Let's go shoot up the project boys' "; victim had not provoked, spoken to, or threatened defendant; and, after defendant shot victim two times and victim begged for his life, defendant shot victim three times more with two wounds to the head); *State v. Brewer*, 328 N.C. 515, 523, 402 S.E.2d 380, 386 (1991) (finding sufficient evidence of specific intent to kill when defendant centered her car, containing her 16-year-old handicapped child in the front seat, on train tracks and then exited vehicle immediately before train struck car).

Defendant also contends, with respect to the felony murder charge, that the State failed to present substantial evidence that Mr. Bass' murder was part of a continuous transaction with the alleged felonies. However, because we have upheld the first degree murder conviction based on premeditation and deliberation, any error in the

submission of felony murder to the jury would be harmless. *See State v. Mays,* 158 N.C. App. 563, 577, 582 S.E.2d 360, 369 (2003) (holding that "any error in allowing a jury to consider felony murder does not require a new trial if the jury also found the defendant guilty based on premeditation and deliberation").

II

**[2]** Defendant next contends that the trial court erred in refusing to admit testimony from two Cumberland County Detention Center employees describing defendant's behavior in 2009. The trial court excluded the testimony under Rule 401 of the Rules of Evidence as irrelevant and under Rule 403 as more prejudicial than probative.

This Court reviews questions of relevancy de novo, but accords deference to the trial court's ruling. *See State v. Lane,* 365 N.C. 7, 27, 707 S.E.2d 210, 223 ("A trial court's rulings on relevancy are technically not discretionary, though we accord them great deference on appeal."), *cert. denied,* ___ U.S. ___, 181 L. Ed. 2d 529, 132 S. Ct. 816 (2011). We hold that the trial court erred in concluding that this evidence was irrelevant.

Here, the two officers—Ms. Mary Hines and Mr. Timothy Crawford—would have testified that they worked at the Cumberland County Detention Center. Ms. Hines' job duties included handing out medications to the inmates and recording when they refused to take them. Between April 2009 and July 2009, the logs showed defendant refused to take his "psych meds." Ms. Hines also would have testified that after defendant stopped taking his medications, he became erratic, even "wild."

Mr. Crawford would have testified that when defendant first arrived, there was no indication that he had any kind of mental problem. After defendant stopped taking his medication, however, Mr. Crawford described his behavior as "basically spaced out," with defendant keeping more to himself, pacing, and "tak[ing] his clothes off and stand[ing] there staring at the wall." Defendant also hoarded his food. Mr. Crawford would have further testified that inmates do not have access to illegal drugs.

In *State v. Boone,* 302 N.C. 561, 276 S.E.2d 354 (1981), the defendant, like defendant in this case, claimed that he was not guilty by reason of insanity. The trial court excluded testimony from a deputy sheriff that when the defendant, after being arrested, set fire to his cell mattress, the defendant " 'was totally unaware of what he was

doing.' " *Id.* at 565, 276 S.E.2d at 357. In holding that the trial court erred in excluding that testimony, the Supreme Court pointed out that "[o]pinion evidence by lay witnesses and lay testimony reciting irrational acts prior or subsequent to the alleged offense is allowed in this State." *Id.* Therefore, the Court held, the deputy sheriff should have been allowed "to give his opinion of defendant's mental state as well as relate the irrational act he observed." *Id.* The Court found the exclusion not prejudicial, however, as other testimony "placed before the jury a complete history and description of defendant's mental condition." *Id.*

Under *Boone*, the testimony of the detention officers, in this case, was relevant to whether defendant suffered from a mental illness, as he claimed for purposes of his insanity and diminished capacity defenses. This testimony would have allowed the jury to infer that the mental health condition was due to mental illness rather than substance abuse and supported defendant's contention that his behavior was the result of not being medicated for his mental illness. *See State v. Griffin*, 136 N.C. App. 531, 550, 525 S.E.2d 793, 806 (2000) ("In order to be relevant, the evidence must have a logical tendency to prove any fact that is of consequence in the case being litigated." (internal quotation marks omitted)).

However, in addition to ruling the testimony irrelevant under Rule 401 of the Rules of Evidence, the trial court also found, under Rule 403, that "the danger of confusion or undue prejudice to the [S]tate exists in that it may confuse the jury as to what the standard is or the time period that we're talking about." *See* N.C.R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."). "We review a trial court's decision to exclude evidence under Rule 403 for abuse of discretion." *State v. Whaley*, 362 N.C. 156, 160, 655 S.E.2d 388, 390 (2008).

At trial, the State did not significantly dispute that defendant was mentally ill, but rather contended that defendant knew right from wrong despite any mental illness. Although defendant claims on appeal that the excluded testimony was important to rebut the State's contention that defendant's actions were due to substance abuse and not the result of mental illness, we believe defendant has mistaken the State's trial argument. In order to rebut defendant's claims that

the death and injuries occurred because the mental health system failed defendant, the State pointed out that defendant's family refused to seek mental health treatment for defendant because they believed his issues were due to substance abuse.

Because of the State's contentions at trial, we cannot find that the trial court abused its discretion in excluding the testimony. Defendant presented voluminous expert and family testimony and the testimony of Judge Keever relating to the actual time frame at issue. Given that evidence, the trial court could reasonably have determined that the probative value of evidence from lay witnesses regarding behaviors in 2009—five years after the events at issue—was substantially outweighed by the potential for jury confusion and undue prejudice.

Moreover, "[t]o establish prejudice based on evidentiary rulings, defendant bears the burden of showing that a reasonable possibility exists that, absent the error, a different result would have been reached." *State v. Lynch*, 340 N.C. 435, 458, 459 S.E.2d 679, 689 (1995). *See also* N.C. Gen. Stat. § 15A-1443(a) (2011). After reviewing the admitted evidence, the State's contentions at trial, and the jury's findings during the capital sentencing portion of the trial, we do not believe that defendant has shown that there is a reasonable possibility that had the evidence been admitted, the jury would have reached a different verdict.

No error.

Judges ROBERT C. HUNTER and ROBERT N. HUNTER, JR. concur.