STATE OF NORTH CAROLINA v. WILLIE FORREST, III

No. COA03-806

(Filed 18 May 2004)

**1. Constitutional Law— right to counsel—personal argument to jury—counsel already appointed**

A defendant who chose to be represented by appointed counsel had no right to also represent himself and personally present his closing arguments to the jury. Moreover, defense counsel read defendant's handwritten statement to the jury.

**2. Appeal and Error— preservation of issues—jury instructions—no objection—no plain error assertion**

A defendant who did not object to jury instructions and did not raise plain error waived appellate review of the trial court's instructions on first-degree kidnapping.

**3. Constitutional Law— Confrontation Clause—kidnap victim's statements following release—*Crawford* analysis**

A kidnapping and assault victim's spontaneous statements to police immediately following her rescue were nontestimonial and were not rendered inadmissible by *Crawford v. Washington*, —— U.S.—— (2004). She was not providing a formal statement, deposition, or affidavit, she did not know that she was bearing witness, and she was not aware that her utterances might impact further proceedings. The Confrontation Clause was not implicated.

**4. Evidence— hearsay—excited utterances—rescued victim**

Statements made by a kidnapping and assault victim immediately after her rescue were admissible as excited utterances.

**5. Evidence— redirect examination—testimony elicited earlier**

The trial court properly admitted testimony over defendant's objection on redirect examination of a detective where defendant had earlier elicited the same testimony on cross-examination.

Judge WYNN dissenting.

Appeal by defendant from judgments entered 7 March 2003 by Judge W. Osmond Smith in Wake County Superior Court. Heard in the Court of Appeals 30 March 2004.

**STATE v. FORREST**

[164 N.C. App. 272 (2004)]

*Attorney General Roy Cooper, by Assistant Attorney General Kevin L. Anderson, for the State.*

*Irving Joyner, for defendant-appellant.*

TYSON, Judge.

Willie Forrest, III, ("defendant") appeals from judgments entered after a jury found him to be guilty of first-degree kidnapping, assault with a deadly weapon, and assault upon a law enforcement officer. We hold defendant received a trial free from error.

## I. Background

The State's evidence tended to show that on 9 October 2002 members of the Selective Enforcement Unit of the Raleigh Police Department went to the home of Cynthia Moore ("Moore"), defendant's aunt. The police officers had reason to believe that defendant was present at the residence and armed with a knife and gun. The officers observed the house for approximately one hour.

While under observation, a man drove up to the house and knocked on the door. Defendant walked out onto the porch and asked the man to give him Moore's car keys. Moore walked out onto the porch and began walking down the steps. Defendant grabbed Moore around the waist and walked her back into the house. Defendant and Moore walked back out onto the porch approximately thirty minutes later. Defendant had his arm around Moore's shoulder and held a knife to her. The officers observed Moore trying to pull away from defendant. During this time, another police car appeared, and Moore stated, "See that. Them be here later." Defendant responded, "I know what those mother f——ers are looking for. They are coming for me." Defendant dragged Moore back inside her house.

Between twenty and thirty minutes later, defendant and Moore came out onto the porch again. Defendant still held the knife in one hand while restraining Moore with the other. They sat on the porch for a few minutes and returned inside the house. When defendant and Moore next exited the house, defendant was holding the knife six inches from Moore's throat. The weapon appeared to be a heavy hunting knife with a four-inch blade. Defendant also held a second knife in his other hand, which appeared to be a steak knife approximately four-inches long. Defendant and Moore began to walk down the sidewalk towards the street.

The officers were instructed to take defendant down. The officers illuminated the lights mounted on their long weapons and ordered defendant to drop the knife. Defendant did not obey the command and began saying, "Don't do it, don't do it." The officers closed in on defendant, he dropped the knife in his left hand, grabbed Moore tighter, and took her onto the ground as he fell on his back. The hunting knife remained four inches from Moore's throat. Defendant used Moore as a shield to prevent the officers from shooting him. Two officers placed submachine guns to defendant's forehead and instructed him to drop the knife. Defendant refused, and the officers grabbed his hands while removing Moore from defendant's grasp. Defendant began shouting, "You are going to have to kill me, you are going to have to shoot me." As Officer A.A. Boone ("Officer Boone") removed the knife from defendant's hand, defendant rolled over onto his stomach with one of his hands underneath him. Officer Boone tried to grab defendant's concealed hand, and defendant bit into Officer Boone's finger. The officers eventually restrained defendant.

Moore suffered small lacerations and bruises on her neck, in addition to a one-and-one-half-inch laceration on her arm with a smaller, very deep laceration in the middle of the cut, which was bleeding profusely. Moore was shaking, crying, and very nervous immediately after the incident. She immediately told Detective Melanie Blalock ("Detective Blalock") what defendant had done to her while they were inside the house.

Defendant testified on his own behalf and stated that he always carries knives for protection, but that he never cut Moore and never held a knife to her throat. He stated that he and Moore were walking down the sidewalk hugging and talking. Defendant explained Moore fell to the ground because he tripped while holding onto her. Defendant denied biting Officer Boone and stated he did not have teeth at the time.

The jury found defendant to be guilty of first-degree kidnapping, assault with a deadly weapon, and assault upon a law enforcement officer. Defendant was sentenced in the aggravated range for 210 months to 261 months for first-degree kidnapping and a consecutive sentence of 150 days for the assault on a law enforcement officer. The trial court arrested judgment for assault with a deadly weapon. Defendant appeals.

## II. Issues

The issues are whether the trial court erred in: (1) preventing defendant from personally presenting his closing arguments to the jury, in violation of his Sixth Amendment rights; (2) instructing the jury on first-degree kidnapping; and (3) allowing a State's witness to present testimony regarding statements made by the victim immediately following defendant's arrest.

## III. Sixth Amendment Right to Counsel

[1] Defendant contends that the trial court violated his Sixth Amendment rights by not allowing him to personally present closing arguments to the jury. We disagree.

The Sixth Amendment to the United States Constitution and Article 1, Section 23 of the North Carolina Constitution provide that every criminal defendant has the right to counsel, either by a retained attorney, an appointed attorney, or the right to self-representation. U.S. Const. amend. VI; N.C. Const. art. 1, § 23. "A defendant has only two choices—'to appear *in propria persona* or, in the alternative, by counsel. There is no right to appear both *in propria persona* and by counsel.' " *State v. Thomas*, 331 N.C. 671, 677, 417 S.E.2d 473, 477 (1992), *appeal dismissed and disc. rev. denied*, 351 N.C. 119, 541 S.E.2d 468 (1999) (quoting *State v. Parton*, 303 N.C. 55, 61, 277 S.E.2d 410, 415 (1981), *disavowed on other grounds by State v. Freeman*, 314 N.C. 432, 333 S.E.2d 743 (1985)). N.C. Gen. Stat. § 1-11 (2003) provides that "[a] party may appear *either in person or by attorney* in actions or proceedings in which he is interested." (emphasis supplied).

When a defendant chooses to be represented by counsel, "[t]actical decisions at trial, other than the right to testify and plead, are generally left to attorney discretion." *State v. McDowell*, 329 N.C. 363, 380, 407 S.E.2d 200, 209 (1991) (citing *Brown v. Dixon*, 891 F.2d 490 (4th Cir. 1989), *cert. denied*, 495 U.S. 953, 109 L. Ed. 2d 545 (1990)). "Having elected for representation by appointed defense counsel, defendant cannot also file motions on his own behalf or attempt to represent himself." *State v. Grooms*, 353 N.C. 50, 61, 540 S.E.2d 713, 721 (2000), *cert. denied*, 534 U.S. 838, 151 L. Ed. 2d. 54 (2001). Only when a "fully informed" defendant and his counsel reach an "absolute impasse" concerning tactical decisions, do the client's desires control. *State v. Ali*, 329 N.C. 394, 404, 407 S.E.2d 183, 189 (1991).

Here, defendant chose to be represented by appointed counsel. At the close of all the evidence, defendant communicated his desire to personally present closing arguments to the jury. The trial court denied defendant's request. Defendant stated that he did not want defense counsel to say anything to the jury on his behalf. The trial court recessed court to allow defendant and defense counsel to confer. Following the recess, defendant indicated that he wanted defense counsel to read his handwritten paragraph to the jury. Defense counsel stated that he would not do this. The trial court spoke with defendant and encouraged defendant to allow his attorney to make the closing argument as his attorney saw fit. Defendant indicated to the trial court that he would accept the court's advice by stating that he "would listen to the wisdom of counsel, and if you say let [defense counsel] do [the closing argument], then that's what I will do."

As defense counsel made his closing argument, which ultimately included defendant's handwritten statement, defendant jumped up from his seat and screamed, "F—k this." Defendant was restrained and removed from the courtroom. When defendant was allowed to return to the courtroom, he informed the trial court that he did not want his attorney stating any elements of the crime charged to the jury because it "was irrelevant to me and I am pretty sure it's irrelevant to a lot of the jurors." The trial court informed defendant that he was not co-counsel and was not representing himself in this case. Defendant, after further discussion, stated, "Yeah, I am ready to move on with it. Let's go with it." Defendant informed the court that he was not going to say anything else and stated, "It's cool. Don't worry about it."

Defendant and defense counsel did not reach an "absolute impasse" in deciding how to proceed with closing arguments. *Ali*, 329 N.C. at 404, 407 S.E.2d at 189. Defendant ultimately consented to defense counsel making the closing arguments. *See State v. Basden*, 339 N.C. 288, 299, 451 S.E.2d 238, 244 (1994), *cert. denied*, 515 U.S. 1152, 132 L. Ed. 2d. 845 (1995) (holding that "just prior to closing arguments defendant consented on the record to his attorney's decision to concede guilt to second-degree murder or voluntary manslaughter," and this "cured any possible error in this case.") As defendant chose to be represented by appointed counsel, he had no right to also represent himself and personally present his closing arguments to the jury. *Grooms*, 353 N.C. at 61, 540 S.E.2d at 721. During presentation of defendant's closing argument, defense counsel also read defendant's handwritten statement to the jury as requested.

STATE v. FORREST

[164 N.C. App. 272 (2004)]

The trial court did not err in denying defendant's request to personally present closing arguments to the jury. Defendant's assignment of error is overruled.

## IV.  First-Degree Kidnapping

**[2]** Defendant has waived his right to appellate review of this issue by failing to object to the jury instructions at trial and by failing to assert plain error in his assignments of error.

"A party may not assign as error any portion of the jury charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly that to which he objects and the grounds of his objection . . . ." N.C.R. App. P. 10(b)(2) (2004). Further, when a defendant fails to specifically and distinctly allege that the trial court's ruling amounts to plain error, defendant waives his right to have the issues reviewed under plain error. *State v. Hamilton*, 338 N.C. 193, 208, 449 S.E.2d 402, 411 (1994). A defendant also waives plain error review by failing to allege plain error in his assignments of error. *State v. Flippen*, 349 N.C. 264, 274-75, 506 S.E.2d 702, 710 (1998), *cert. denied*, 526 U.S. 1135, 143 L. Ed. 2d 1015 (1999).

Defendant failed to object to the jury instructions regarding first-degree kidnapping after being specifically asked twice by the trial court whether he had any objections. Defendant also failed to allege plain error in his brief or in his assignments of error. Defendant's assignment of error is dismissed.

## V.  Victim's Statements Immediately
## Following Defendant's Arrest

**[3]** Defendant contends that the trial court erred in allowing into evidence statements made by Moore to a police officer immediately following defendant's arrest. We disagree.

### A.  *Crawford v. Washington*

The United States Supreme Court in *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177 (2004), recently overturned the previously well-settled rule of *Ohio v. Roberts*, 448 U.S. 56, 65 L. Ed. 2d 597 (1980), "and substantially altered the law with respect to the Sixth Amendment's Confrontation Clause and the relationship of that Clause to various rules of evidence regarding hearsay and hearsay exceptions." *People v. Moscat*, 777 N.Y.S. 2d 875 (2004).

Under the prior rule of *Ohio v. Roberts*, the admission of an unavailable witness's statements against a criminal defendant at trial did not violate the Confrontation Clause, provided that the statement bore adequate indicia of reliability. To meet that test the statement had to either 1) fall within a "firmly rooted hearsay exception", or 2) bear "particularized guarantees of trustworthiness."

*Id.* at 740. "Crawford rejects the *Roberts* approach. In particular, the *Crawford* Court focused on the second part of the *Roberts* rule which permits the introduction of hearsay statements when the trial court finds that they bear 'particularized guarantees of trustworthiness.' " *Id.*

The *Crawford* Court held

the Sixth Amendment's Confrontation Clause bars the use of a "*testimonial*" statement made by a witness who does not appear at a criminal trial, unless the witness is unavailable to testify at trial and was subject to cross-examination at the time the statement was made. On the other hand . . . where the statement is not "testimonial" in nature, the Confrontation Clause is ordinarily not implicated; in such a case the statement's admissibility is merely a matter of applying evidentiary rules regarding hearsay and various hearsay exceptions.

*Id.* at 741 (citing *Crawford*, 541 U.S. at 53, 158 L. Ed. 2d at 203).

Under *Crawford*, a Sixth Amendment Confrontation Clause analysis is whether a particular statement is testimonial or non-testimonial in nature, and not whether the statements offered into evidence fall into a well-rooted hearsay exception, such as the "excited utterance" exception. *Moscat*, at 744. However, the Crawford decision "expressly declines to define what a testimonial statement is . . . ." *Id.* at 742. We must first decide whether Moore's statements are testimonial or non-testimonial in nature. If these statements are non-testimonial, then the Confrontation Clause is not implicated, and "the statement's admissibility is merely a matter of applying evidentiary rules regarding hearsay and various hearsay exceptions." *Id.* at 741.

*Moscat* is one of the first cases to interpret *Crawford*. The Criminal Court of New York had to determine whether a 911 call made by the victim was testimonial or non-testimonial. *Id.* at 744. The court held that the 911 call was non-testimonial in nature and "is

**STATE v. FORREST**

[164 N.C. App. 272 (2004)]

essentially different in nature than the 'testimonial' materials that *Crawford* tells us the Confrontation Clause was designed to exclude." *Id.* The court stated:

> A 911 call is typically initiated not by the police, but by the victim of a crime. It is generated not by the desire of the prosecution or the police to seek evidence against a particular suspect; rather, the 911 call has its genesis in the urgent desire of a citizen to be rescued from immediate peril. Thus a pretrial examination is clearly "testimonial" in nature in part because it is undertaken by the government in contemplation of pursuing criminal charges against a particular person. But a 911 call is fundamentally different; it is undertaken by a caller who wants protection from immediate danger. *A testimonial statement is produced when the government summons a citizen to be a witness; in a 911 call, it is the citizen who summons the government to her aid.*

*Id.* (emphasis supplied). The court went on to explain:

> Moreover, a 911 call can usually be seen as part of the criminal incident itself, rather than as part of the prosecution that follows. Many 911 calls are made while an assault or homicide is still in progress. Most other 911 calls are made in the *immediate* aftermath of the crime. Indeed, the reason why a 911 call can qualify as an "excited utterance" exempt from the rules of evidence barring hearsay is that very little time has passed between the exciting event itself and the call for help; the 911 call qualifies as an excited utterance precisely because there has been no opportunity for the caller to reflect and falsify her (or his) account of events.

*Id.* at 746.

> The Confrontation Clause spells out the right of defendant to confront the "witnesses" against him. A person who gives a formal statement, or deposition, or affidavit is conscious that he is bearing witness, and that his words will impact further legal proceedings. That is not usually the case with a 911 call. Typically, a woman who calls 911 for help because she has just been stabbed or shot is not contemplating being a "witness" in future legal proceedings; she is usually trying simply to save her own life.

*Id.*

The reasoning set forth in the *Moscat* holding that a 911 call is non-testimonial also applies here. Moore's statements concerning her kidnapping and violent assault were made immediately after her rescue by police with no time for reflection or thought on Moore's part. These statements were initiated by the victim, as was the 911 call in *Moscat*. Detective Blalock testified that she did not have to ask Moore questions because she "immediately abruptly started talking." Moore was nervous, shaking, and crying. Her demeanor never changed during the conversation with Detective Blalock. Although Detective Blalock was at the scene specifically to respond to Moore and later asked some questions, Detective Blalock did not question Moore until after she "abruptly started talking." These facts do not warrant the conversation being deemed a "police interrogation" under *Crawford*.

Just as with a 911 call, a spontaneous statement made to police immediately after a rescue can be considered "part of the criminal incident itself, rather than as part of the prosecution that follows." *Id.* Further, a spontaneous statement made immediately after a rescue from a kidnapping at knife point is typically not initiated by the police. *Id.* at 744. Moore made spontaneous statements to the police immediately following a traumatic incident. She was not providing a formal statement, deposition, or affidavit, was not aware that she was bearing witness, and was not aware that her utterances might impact further legal proceedings. *Id.* at 746. *Crawford* protects defendants from an absent witness's statements introduced after formal police interrogations in which the police are gathering additional information to further the prosecution of a defendant. *Crawford* does not prohibit spontaneous statements from an unavailable witness like those at bar.

We hold that Moore's statements are non-testimonial in nature. The Confrontation Clause is not implicated, and the trial court did not err in receiving Moore's statements into evidence without the defendant having a chance to cross-examine Moore. "[T]he statement's admissibility is merely a matter of applying evidentiary rules regarding hearsay and various hearsay exceptions." *Id.* at 741.

## B. "Excited Utterances"

[4] We now must determine whether the statements at bar were "excited utterances" to fit within a recognized exception to the hearsay rule. Rule 801(c) of the North Carolina Rules of Evidence defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to

prove the truth of the matter asserted." N.C. Gen. Stat. § 8C-1, Rule 801(c) (2003). Rule 802 states, "[h]earsay is not admissible except as provided by statute or by these rules." N.C. Gen. Stat. § 8C-1, 802 (2003). Rule 803(2) provides an exception to the hearsay rule:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . . .
>
> (2) Excited Utterance.—A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

N.C. Gen. Stat. § 8C-1, Rule 803(2) (2003). "It is well established that in order for an assertion to come within the parameters of this particular exception, 'there must be (1) a sufficiently startling experience suspending reflective thought and (2) a spontaneous reaction, not one resulting from reflection or fabrication.' " *State v. Coria*, 131 N.C. App. 449, 451, 508 S.E.2d 1, 3 (1998) (quoting *State v. Thomas*, 119 N.C. App. 708, 712-13, 460 S.E.2d 349, 352, *disc. review denied*, 342 N.C. 196, 463 S.E.2d 248 (1995) (citing *State v. Smith*, 315 N.C. 76, 86, 337 S.E.2d 833, 841 (1985)).

Detective Blalock, who was standing by at a nearby school and waiting to speak to Moore, approached Moore immediately after her rescue and defendant's capture and arrest. Detective Blalock was not present at Moore's rescue, but arrived immediately after Moore was placed in a secure area. Detective Blalock testified that she spoke to Moore "immediately after they took her from the suspect." Detective Blalock further testified that she did not have to ask Moore questions because Moore "immediately abruptly started talking." Moore was nervous, shaking, and crying due to defendant's kidnapping her, holding her at knifepoint, and her wounds. Her demeanor never changed during the conversation with Detective Blalock. Moore told Detective Blalock that defendant had: (1) detained her in her house; (2) taken her from place to place with a knife at her throat; (3) cut her arm when she attempted to escape out the front door; and (4) possessed numerous knives while she was held captive. Moore's statements concerning her kidnapping and violent assault were made immediately after her rescue by police with no time for reflection or thought.

The facts in *State v. Guice* are very similar to the facts at bar. 141 N.C. App. 177, 541 S.E.2d 474 (2000), *cert. denied*, 353 N.C. 731, 551 S.E.2d 112 (2001). The defendant arrived at the victim's home unan-

nounced and confronted her. *Id.* at 180, 541 S.E.2d at 477. The defendant proceeded to point a gun at the victim's neighbor and dragged the victim outside. *Id.* Shortly thereafter, a police officer arrived at the scene and spoke with the victim. *Id.* We held that the trial court properly admitted these statements as "excited utterances" pursuant to Rule 803(2) of the North Carolina Rules of Evidence. *Id.* at 201, 541 S.E.2d at 489. Our Courts have consistently held statements of this nature to be admissible under the "excited utterance" hearsay exception. *See State v. Gaines,* 345 N.C. 647, 672, 483 S.E.2d 396, 411, *cert. denied,* 522 U.S. 900, 139 L. Ed. 2d 177 (1997) (holding that statements made by a victim to police officers after she was shot were admissible under the "excited utterance" exception as they described the circumstances surrounding the shooting and immediately followed the shooting); *State v. Wright,* 151 N.C. App. 493, 496-97, 566 S.E.2d 151, 154 (2002) (holding that statements made by victim in response to questions asked by 911 operator were excited utterances); *Coria,* 131 N.C. App. at 451, 508 S.E.2d at 3 (holding that statement made to police officer shortly after being assaulted was admissible under the excited utterance exception because the witness was very excited and upset when the statement was made and had no opportunity to reflect on her statement).

Moore's statements, made immediately after rescue from defendant, described the events surrounding her kidnapping and assault and clearly fall within the "excited utterance" exception to the hearsay rule. The trial court did not err in admitting these statements under the "excited utterance" exception to the hearsay rule.

**[5]** Defendant also contends that the trial court erred in allowing Detective Blalock to testify to statements made by Moore in a subsequent conversation later that day. We disagree.

Testimony regarding these statements was initially elicited by defense counsel. In an attempt to impeach Moore's earlier statements admitted as excited utterances, defense counsel cross-examined Detective Blalock and elicited testimony pertaining to statements in which Moore said she and defendant used drugs and drank alcohol together. On redirect, the State asked Detective Blalock regarding the conversation defendant elicited on cross-examination. Defendant objected to some of these questions. The trial court overruled defendant's objections.

Our Supreme Court has held, "[w]here evidence is admitted over objection, and the same evidence has been previously admitted or is

later admitted without objection, the benefit of the objection is lost." *State v. Whitley*, 311 N.C. 656, 661, 319 S.E.2d 584, 588 (1984) (citing *State v. Maccia*, 311 N.C. 222, 316 S.E.2d 241 (1984)). Rule 806 of our North Carolina Rules of Evidence states, "[w]hen a hearsay statement has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness." N.C. Gen. Stat. § 8C-1, Rule 806 (2003).

Defendant attacked Moore's credibility during cross-examination of Detective Blalock and elicited testimony he now assigns as error. The trial court did not err in allowing this testimony into evidence. *See id.*; *see also Whitley*, 311 N.C. at 661, 319 S.E.2d at 588. Defendant's assignment of error is overruled.

## VI. Conclusion

Defendant failed to show that the trial court erred by not allowing him to personally present closing arguments to the jury when he was represented by counsel. Defendant also failed to object to the jury instructions regarding first-degree kidnapping or to assign plain error to this issue and has waived his right to appellate review. Defendant failed to show that the trial court violated his Sixth Amendment right of confrontation in admitting the victim's non-testimonial statements, uttered immediately after her rescue, into evidence. Defendant also failed to show that the trial court erred in admitting the victim's statements when defendant elicited the same testimony on cross-examination.

No error.

Judge HUNTER concurs.

Judge WYNN dissents.

WYNN, Judge, dissenting.

As I disagree with the majority's conclusion that the witness' statements to law enforcement officers were nontestimonial in nature, I respectfully dissent.

*Crawford* holds that "[w]here testimonial evidence is at issue . . . the *Sixth Amendment* demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id.* at

——, 158 L. Ed. 2d at 203. Where nontestimonial hearsay is at issue, however, "it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law." *Id.* "Thus, under *Crawford*, Sixth Amendment Confrontation Clause analysis will usually turn on the question whether a particular statement is testimonial in nature or not." *Moscat*, 2004 N.Y. Misc. LEXIS at 5. The first task for this Court under a proper *Crawford* analysis, therefore, is to determine whether or not the victim's statement to law enforcement officers in the instant case was testimonial. *See id.* at 13 (stating that, "[u]nder *Crawford*, the relevant inquiry now is *not* whether the [out-of-court statement] falls into a well-rooted hearsay exception such as the 'excited utterance.' Rather, the relevant inquiry under *Crawford* is whether [the out-of-court statement] is testimonial in nature.").

The *Crawford* Court expressly declined to define the term "testimonial." *See Crawford*, —— U.S. at ——, 158 L. Ed. 2d at 203 (stating that, "We leave for another day any effort to spell out a comprehensive definition of 'testimonial' "). At a minimum, however, the term applies "to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* Regarding police interrogations, *Crawford* specifically notes that the term "interrogation" is used "in its colloquial, rather than any technical legal, sense." *Id.* at —— n.4, 158 L. Ed. 2d at 194, n.4. "Just as various definitions of 'testimonial' exist, one can imagine various definitions of 'interrogation' . . . ." *Id. Crawford* further warns that

> Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard. Police interrogations bear a striking resemblance to examinations by justices of the peace in England. The statements are not *sworn* testimony, but the absence of oath was not dispositive. . . .
>
> . . . .
>
> That interrogators are police officers rather than magistrates does not change the picture either. Justices of the peace conducting examinations under the Marian statutes were not magistrates as we understand that office today, but had an essentially investigative and prosecutorial function. England did not have a professional police force until the 19th century, so it is not surprising that other government officers performed the investigative functions now associated primarily with the police. The involvement of government officers in the production of testimo-

nial evidence presents the same risk, whether the officers are police or justices of the peace.

In sum, even if the *Sixth Amendment* is not solely concerned with testimonial hearsay, that is its primary object, and interrogations by law enforcement officers fall squarely within that class.

*Id.* at ——, 158 L. Ed. 2d at 193-94 (citations omitted).

In the instant case, the witness gave a statement to law enforcement officers describing Defendant's actions during the incident for which he was tried and convicted. Defendant had no opportunity to cross-examine the witness concerning her statements to law enforcement officers, and the witness did not appear at trial. The police officer who interviewed the witness, Detective Blalock, testified it was her "responsibility . . . first to stand by at Mary Phillips school while we waited to determine if the [area] had been secured, meaning that . . . the victim had been removed to safety" and then to "go to the location and get that person and interview that person." After police officers removed Defendant from the scene and the area was secure, Detective Blalock arrived and took the witness' statement, which was later used at trial.

The majority relies upon the reasoning set forth in *Moscat* in concluding that the witness' statement to Detective Blalock was non-testimonial. In *Moscat*, the New York court determined that a 911 telephone call requesting emergency assistance was nontestimonial. The situation presented by a 911 call, however, is fundamentally different from the facts of the instant case. As noted by the *Moscat* court, a 911 call "is generated not by the desire of the prosecution or the police to seek evidence against a particular suspect; rather the 911 call has its genesis in the urgent desire of a citizen to be rescued from immediate peril." *Moscat*, 2004 N.Y. Misc. LEXIS at 13.

Here, Detective Blalock's sole purpose at the scene of the incident was to obtain the victim's statement for use in prosecution of Defendant. The scene was secure, Defendant was absent, and the witness was no longer in any possible peril. Detective Blalock was not the first police officer encountered by the witness at the scene. The witness did not make any statements to the other police officers. Instead, she made her statement to Detective Blalock, who was the designated officer to receive it. The witness did not speak to Detective Blalock in an effort to obtain assistance; rather, she gave a statement because she knew that the police were there to gather evi-

dence concerning the crime. As such, I strongly disagree with the majority's statement that the witness "was not aware that she was bearing witness, and was not aware that her utterances might impact further legal proceedings." Further, the witness' demeanor and the length of time in which she had to reflect upon her statement are relevant only to a traditional "reliability" analysis under the "excited utterance" exception; they have absolutely no bearing upon whether or not the statement was testimonial or not.

I would hold that the witness' statement to Detective Blalock was essentially testimonial in nature. Contrary to the majority's statement that "*Crawford* protects defendants from absent witness's statements introduced after formal police interrogations," *Crawford* expressly states that the term "interrogation" can assume "various definitions" and should be read "in its colloquial, rather than any technical legal, sense." *Crawford*, —— U.S. at ——, n.4, 158 L. Ed. 2d at 194, n.4. Further,

> [i]nvolvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse—a fact borne out time and again throughout a history with which the Framers were keenly familiar. This consideration does not evaporate when testimony happens to fall within some broad, modern hearsay exception, even if that exception might be justifiable in other circumstances.

*Id.* at ——, n.7, 158 L. Ed. 2d at 196, n.7. Detective Blalock took the witness' statement in an effort to gather evidence concerning the incident for which Defendant was tried and convicted. The witness waited to make her statement until Detective Blalock arrived. It strains credulity to conclude that the witness was unaware that she was bearing witness, or that her statement was one she could not "reasonably expect to be used prosecutorially." *Id.* at ——, 158 L. Ed. 2d at 193 (proffering as one example of a testimonial statement "pretrial statements that declarants would reasonably expect to be used prosecutorially").

Because the trial court admitted the witness' testimonial statement against Defendant, despite the fact that Defendant had no opportunity to cross-examine her, such admission violated Defendant's Sixth Amendment right to confrontation. *Id.* at ——, 158 L. Ed. 2d at 203. I therefore dissent.