[799 NYS2d 472]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v NORMAN BRADLEY, Appellant.

First Department, July 28, 2005

## APPEARANCES OF COUNSEL

*Laura R. Johnson, The Legal Aid Society,* New York City (*Robert Budner* of counsel), for appellant.

*Robert M. Morgenthau, District Attorney,* New York City (*Susan Axelrod* and *Mark Dwyer* of counsel), for respondent.

## OPINION OF THE COURT

TOM, J.P.

In the absence of testimony by the victim of an assault, whose whereabouts could not be ascertained, the chief evidence against defendant was her out-of-court statement to a police officer, admitted as an excited utterance, that "her boyfriend threw her through a glass door." Defendant argues that this statement was "testimonial" within the contemplation of *Crawford v Washington* (541 US 36 [2004]) and, thus, violated his constitutional rights to confrontation and due process. This Court concludes that the contested evidence was not testimonial, and we find no merit to defendant's further contentions that his guilt was not established beyond a reasonable doubt and that his conviction was inconsistent with the weight of the evidence.

On New Year's Day 2003 at about 12:40 P.M., a police officer responding to a 911 call went to 175 Sherman Avenue, Bronx, New York, where he "was greeted at the door by a young lady who was visibly shaken. She had blood smear[ed] on her face, on a white T-shirt and blue jeans that she was wearing." The officer observed that she was limping and "bleeding very profusely from the left side of her hand." Over defendant's

objection, the officer testified, "I asked her what happened, and she stated her boyfriend threw her through a glass door, which consists of a French door with eight panes." The officer then entered the apartment, where he observed that several of the door panes were broken and that there was broken glass on the floor. He saw defendant lying face-down on a mattress. The officer called for an ambulance and placed defendant under arrest.

Although the victim did not give testimony at trial, the People introduced the T-shirt and blue jeans she was wearing, medical records of her treatment and photographs of the apartment. Also introduced were two orders of protection, in effect at the time of the incident, directing defendant to "stay away" from her and to "[r]efrain from assault, stalking, harassing, menacing, reckless endangerment, disorderly conduct, intimidation, threats or otherwise interfering with the victim."

Defendant testified that he and the victim had known each other for about 10 years but were "just friends." She did not rent a room at the rooming house but, as a friend of the landlord, she stayed at the apartment once in a while. Defendant did not associate with her because of the orders of protection. He denied they had an argument that evening. Defendant stated that he had been drinking with the landlord and another tenant, named Miguel, and had fallen asleep between 3:00 and 4:00 A.M. At about 12:30 P.M. defendant felt a hand enter his pocket and tried, unsuccessfully, to grab it. Nothing was missing, and he could not see who left the room due to his poor eyesight. A few minutes later, he heard water running and the sound of glass shattering. He went to the bathroom, where he saw the victim, holding her bleeding hand and wiping her shirt. She was the only other person left in the apartment.

Defendant introduced a letter from the victim, which states:

> "To whom it may concern: This letter is to explain that the charges that were placed . . . on Norman Bradley are false and untrue. The truth is I punched the French door window causing my hand to get cut because we had an argument. He never put his hands on me."

Defendant testified that a number of glass panes on the French door had been broken long before New Year's Day and that he had observed a cat belonging to one of the other tenants jump through the openings to get into the room.

The jury convicted defendant of two counts of aggravated criminal contempt, two counts of criminal contempt in the first

degree, and one count of assault in the third degree. The court imposed concurrent sentences of two to four years on each of the four contempt counts and one year on the assault count.

On appeal, defendant argues that the People's case was based entirely upon the victim's out-of-court statement to the arresting officer that "her boyfriend threw her through a glass door." Defendant contends that this statement was elicited from the victim by the officer pursuant to an investigation, thereby rendering the question part of a structured interrogation. Further, in view of the victim's history of obtaining orders of protection against defendant, he contends that a reasonable person in her situation would have understood that any statement she made was likely to be used for prosecutory purposes. Therefore, defendant concludes, the statement must be considered "testimonial" within the meaning of *Crawford v Washington*, and its admission at trial constituted a violation of his right to confront the sole witness against him (US Const 6th, 14th Amends; NY Const, art I, § 6).

In *Crawford* (541 US at 60-61), the United States Supreme Court departed from the rationale of *Ohio v Roberts* (448 US 56, 66 [1980]) with respect to the receipt of out-of-court declarations that constitute "testimonial" evidence. The Court reasoned that *Roberts* compromised the protection afforded the accused by the Confrontation Clause, observing that it "does not bar admission of an unavailable witness's statement against a criminal defendant if the statement bears adequate indicia of reliability" (internal quotation marks omitted), a criterion which is met, under *Roberts*, if the proffered evidence comes within the ambit of a "firmly rooted hearsay exception" or if it bears "particularized guarantees of trustworthiness" (*Crawford*, 541 US at 40). The Court examined the interpretation of the right to confrontation reflected in the common law at the time of the nation's founding, concluding that the right sought to be protected was the right of cross-examination (*id.* at 49-50). By way of example, it quoted *State v Webb* (2 NC 103, 104 [1794]): " '[I]t is a rule of the common law, founded on natural justice, that no man shall be prejudiced by evidence which he had not the liberty to cross examine' " (*Crawford*, 541 US at 49).

*Crawford* concludes that the right of an accused to examine prosecution witnesses cannot be subordinated to rules governing admissibility: "Leaving the regulation of out-of-court statements to the law of evidence would render the Confrontation

Clause powerless to prevent even the most flagrant inquisitorial practices" (*id.* at 51). Thus, irrespective of the "reliability" of an out-of-court utterance, it remains subject to the right of the accused to examine persons who give "testimony." The Court observed, "Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability' " (*id.* at 61). To receive the testimonial statement of a witness, the Court stated, "the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination. We leave for another day any effort to spell out a comprehensive definition of 'testimonial' " (*id.* at 68).

While rejecting requests to endorse an inclusive definition, the Court mentioned " 'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions' " (*id.* at 51-52, quoting *White v Illinois,* 502 US 346, 365 [1992] [Thomas, J., concurring]). It noted that "some statements qualify under any definition—for example, *ex parte* testimony at a preliminary hearing" (541 US at 52). Statements taken by police officers in the course of interrogation are also testimonial (*id.*). While the Court similarly declined to ascribe a precise legal meaning to the term "interrogation," it noted that a "recorded statement, knowingly given in response to structured police questioning, qualifies under any conceivable definition" (*id.* at 53 n 4).

Applying these principles to the instant matter, the operative question is whether the victim's statement was made in the context of an interrogation by police so as to render it testimonial in nature and, therefore, inadmissible because defendant had no opportunity to cross-examine the witness against him. Defendant advances two arguments: (1) the arresting officer elicited the victim's statement in the course of his investigation into the assault, thus making his question part of an interrogation, and (2) the victim was aware that her response was likely to be used for prosecutory purposes because she had been issued two protective orders against defendant.

Even assuming that the circumstances under which the statement was obtained can be considered an "interrogation," they are hardly comparable to the "structured" interrogation found to be subject to the Confrontation Clause in *Crawford.* Michael Crawford was convicted of first-degree assault while armed with a deadly weapon, which offense he committed in the presence of

his wife. The defendant and his wife, who was also a suspect, were each interrogated twice and gave materially different accounts of the incident, particularly with respect to whether the victim was attempting to pull a weapon from his pocket at the time the defendant stabbed him. While the wife did not testify because of the spousal privilege, the trial court admitted into evidence her tape-recorded statement to police, not only implicating her husband in the victim's stabbing but also undermining his self-defense claim. Crawford's conviction was ultimately sustained by the Washington Supreme Court.

The detailed, particularized and memorialized questioning undertaken in *Crawford* stands in marked contrast to the simple question posed to the victim in this matter. It is difficult to imagine a more spontaneous, general and preliminary inquiry addressed in an unstructured context than a police officer arriving at a crime scene and merely asking, "[W]hat happened?"

Preliminary, on-scene interviews are clearly distinguishable from the ex parte testimony found to be excludable on Sixth Amendment grounds in *Crawford*. As this Court observed in *People v Newland* (6 AD3d 330, 331 [2004], *lv denied* 3 NY3d 679 [2004]), "a brief, informal remark to an officer conducting a field investigation" does not implicate the civil-law abuses sought to be avoided by preserving the accused's right to confront a witness (*see also People v Mackey*, 5 Misc 3d 709 [2004]). Typical of the abuses cited in *Crawford* was the procedure employed in pre-Revolution times in Stamp Act cases that were given "to the admiralty courts, which followed civil-law rather than common-law procedures and thus routinely took testimony by deposition or private judicial examination" (*Crawford*, 541 US at 47-48). In accordance with the Supreme Court's analysis, this Court has held that a codefendant's plea allocution is excludable as a formal, judicial colloquy of the type under immediate concern in *Crawford* (*People v Woods*, 9 AD3d 293 [2004]; *People v A.S. Goldmen, Inc.*, 9 AD3d 283 [2004], *lv denied* 3 NY3d 703 [2004]), and the Court of Appeals has recently agreed (*People v Hardy*, 4 NY3d 192 [2005]), overruling the precedent set in *People v Thomas* (68 NY2d 194 [1986]).

Other courts that have confronted the issue have held that statements by witnesses to police engaged in a preliminary investigation are not testimonial. In *Hammon v State* (809 NE2d 945 [Ind 2004]), police responded to a house "in a state of disarray with broken objects littering the floor" (*id.* at 947). One officer separated the defendant from the victim, who appeared

"timid and frightened," and learned that she had been thrown into some broken glass on the floor and punched twice in the chest (*id.* at 948). The Indiana Court of Appeals held that the victim's statement, admitted as an excited utterance, was not testimonial because it lacked "the official and formal quality of such a statement" (*id.* at 952). The court held that "when police arrive at the scene of an incident in response to a request for assistance and begin informally questioning those nearby immediately thereafter in order to determine what has happened, statements given in response thereto are not 'testimonial' " (*id.*). The court reasoned that the victim's statement was not given in response to interrogation because the questioning occurred at a residence, not a police station, and the statement was made in response to preliminary investigatory questions posed at the scene of a crime, shortly after it had occurred (*id.*).

Similarly, in *State v Forrest* (164 NC App 272, 596 SE2d 22 [2004]), the North Carolina Court of Appeals held that a statement made to police by a victim held at knife-point was not testimonial. The responding officers believed the defendant to be in the victim's residence, which they placed under observation for approximately one hour. The defendant spotted the police, grabbed the victim and took her back into the house. They eventually emerged with the defendant holding a hunting knife to the victim's throat. He was subdued by heavily armed police officers and the victim released from his grasp. She was immediately questioned and described what defendant had done to her while they were inside the home (*id.* at 23-24). The Court observed that the victim "made spontaneous statements to the police immediately following a traumatic incident. She was not providing a formal statement, deposition, or affidavit, was not aware that she was bearing witness, and was not aware that her utterances might impact further legal proceedings" (*id.* at 27).

Defendant relies on *Moody v State* (277 Ga 676, 594 SE2d 350 [2004]) in support of his contention that a victim's statement to responding police officers shortly after an incident is testimonial under *Crawford*. *Moody*, however, is both distinguishable on its facts and unclear in its rationale. In that case, the statement at issue concerned an incident that had occurred two years prior to the victim's murder, when the defendant discharged a shotgun into the bedroom of a house in which she was sleeping (277 Ga at 678, 594 SE2d at 352-353). The statement of a police officer, concerning what the victim had told him after the shoot-

ing, was introduced to establish that there had been prior difficulties between the victim and the defendant (277 Ga at 680, 594 SE2d at 354). The decision engages in no analysis of what sort of evidence "testimonial" might include, beyond stating, "it appears that the term encompasses the type of field investigation of witnesses at issue here." (*Id.* n 6.)

*United States v Nielsen* (371 F3d 574 [9th Cir 2004]), also relied upon by defendant, is factually distinguishable in that the statement at issue was obtained from a mere witness, during an investigative search of the defendant's home. The statement was used at trial to demonstrate that the defendant had access to a safe containing drugs (*id.* at 578). In the matter before us, by contrast, the declarant was the victim, and the officer's purpose in asking the question was simply to assess the situation immediately confronting him.

Finally, defendant notes that the courts of this state have drawn differing conclusions as to the application of *Crawford* to 911 calls. However, whether a call initiated by or on behalf of a victim in immediate danger (*see People v Moscat*, 3 Misc 3d 739 [2004]; *People v Conyers,* 4 Misc 3d 346 [2004]) should be distinguished from a call placed by an unendangered witness who reported seeing a man firing a gun (*see People v Cortes*, 4 Misc 3d 575 [2004]) is not an issue before this Court. For the purposes of this appeal, it suffices to say that the answer by a victim of a crime asked "[W]hat happened?" by a police officer responding to the scene does not take place in the context of structured interrogation and, thus, does not implicate the proscription against the use of a testimonial statement at trial on the ground that it violates a defendant's right to confront the witness against him.

Alternatively, defendant relies on *United States v Saget* (377 F3d 223 [2d Cir 2004]), arguing that the victim's statement must be considered testimonial because she should have known that it would be used against him at trial. The *Saget* court observed that examples of testimonial statements given in *Crawford* "all involve a declarant's knowing responses to structured questioning in an investigative environment or a courtroom setting where the declarant would reasonably expect that his or her responses might be used in future judicial proceedings" (*id.* at 228, citing 541 US at 53 n 4). The use of these examples, the Circuit Court concluded, "suggests that the Court would use the reasonable expectation of the declarant as the anchor of a more concrete definition of testimony" (*Saget*, 377 F3d at 229).

However, the Circuit Court did not actually apply the proffered test "because *Crawford* indicates that the specific type of statements at issue here are nontestimonial in nature" (*id.*). The *Saget* court held that the statements of a coconspirator to a confidential informant were not testimonial since he was not even aware that he was speaking to an informant or that the statements were being recorded.

The difficulty in the approach suggested by the Circuit Court's dictum is illustrated by the instant matter, in which defendant contends that a spontaneous statement made to a police officer in response to a precursory inquiry should be deemed testimonial. Due to the orders of protection issued to the victim, defendant maintains that she "would certainly have known that her statement would further a prosecutorial investigation against appellant and would likely be used against appellant in court."

Defendant has simply taken the reasoning of *Saget* to its logical extreme. He intimates that a declarant should reasonably anticipate that *any* statement made to an investigating officer is likely to be used as evidence at trial. Nothing in *Crawford* suggests that the Court intended to erect so formidable a barrier to the introduction of out-of-court statements. Significantly, while the expectation of the witness was urged upon the Court as the defining criterion for a testimonial statement, the Court declined to adopt that, or any other, formulation.

A more tenable approach is suggested in *Mungo v Duncan* (393 F3d 327 [2d Cir 2004] [habeas corpus]), also in dictum. In *Mungo* (at 329), police officers responding to a shooting asked the victim, Brent Arthur, "Who shot you? Those guys running?" Based on what they were told, the officers apprehended two men and secured Arthur's identification of the suspects. Arthur then specifically identified Marcus Mungo as the man who fired the gun in the course of a robbery. Arthur died a short time later, and his "several statements tending to identify" Mungo as the person who shot him were admitted into evidence as excited utterances (*id.* at 330; *see People v Mungo*, 287 AD2d 523 [2001], *lv denied* 97 NY2d 685 [2001]).

In *Mungo* (393 F3d at 336), the Circuit Court held that it was unnecessary to engage in an analysis of the circumstances leading to the contested statements because retroactive application of *Crawford* on collateral review of a state court decision is barred under *Teague v Lane* (489 US 288 [1989]). In a footnote, however, the court reflected on the application of the " 'testimonial' concept" to the facts before it, concluding that *Crawford*

does not bar the use of out-of-court statements made in response to "investigatory and hot-pursuit questions" (*Mungo*, 393 F3d at 336 n 9):

> "As for the answers to the early questions, delivered in emergency circumstances to help the police nab Arthur's assailants, we doubt that these were of the type of declarations the Court would regard as testimonial. As for the final statement, however, made after Mungo and Stewart had been caught, and after Arthur had confirmed that they were the men who shot him, specifically that it was Mungo who shot the gun and that the motive was robbery, this statement seems to have been made in greater formality with a view to creating a record and proving charges. It seems more likely to fall within the category the Court described as testimonial." (*Id.*)

Rather than attempting to assess the expectation of the declarant regarding the probable use of any statement that might be forthcoming, the better approach is to evaluate the objective of the person posing the question. Where the purpose of the inquiry is to gain general familiarity with the situation confronting a police officer to determine what happened, the officer is making only a preliminary investigatory inquiry. Thus, the response is not the product of a structured police interrogation and should not be regarded as testimonial. However, where the purpose of the inquiry is to gather incriminating evidence against a particular individual, the officer is advancing a potential prosecution, and the response takes on a testimonial character. As the facts of *Mungo* illustrate, the temporal proximity to the criminal incident and the immediacy of the need to take action are pertinent to the assessment of whether inquiries are to be considered "investigatory and hot-pursuit questions," on the one hand, or interrogational, on the other. Depending on the emergent circumstances, the same officer who initially sought to obtain preliminary information in a crisis situation can subsequently assume a quasi-prosecutory function once the need for immediate action expires.

■ Applying this test to the facts at bar, it is clear that the responding police officer merely posed a general question to elicit information needed to evaluate the circumstances and take appropriate action. The officer testified that he was responding to a "call for help" and apparently did not know whether the cause of the victim's injury was accidental or crim-

inal. He asked a preliminary and nonspecific question, not calculated to elicit incriminating evidence. Until he heard the victim's response, he was not even aware that defendant was the particular person to be targeted for investigation. Because the officer was merely making a preliminary inquiry, not performing a quasi-prosecutory function at the time he posed the question, the answer he received cannot be characterized as testimonial.

■ As an additional ground for reversal, defendant asserts that the verdict is unsupported by legally sufficient evidence. He argues that because the victim's out-of-court statement was contradicted by her letter repudiation, the jury had no non-speculative basis for resolving her conflicting accounts of the incident. This contention is not preserved for review (CPL 470.05 [2]). In any event, it is without merit.

Viewing the evidence in a light most favorable to the prosecution (*People v Contes*, 60 NY2d 620, 621 [1983]), it establishes that the victim sustained a cut from contact with a broken pane of a French door within an apartment, where the only persons present were defendant and the victim. Whether the injury was sustained by accident, by the victim's intentional act or by defendant's assault presented a clear question of fact for resolution by the jury. Similarly, the inconsistency between the victim's out-of-court statement and her subsequent recantation letter merely serves to raise a factual issue. The jury was free to discount the letter as the victim's attempt to exculpate her partner in an ongoing romantic relationship (*see People v Hislop*, 303 AD2d 334 [2003], *lv denied* 100 NY2d 582 [2003]) or even reject it as a forgery. An admissible out-of-court statement, if credited, affords a sufficient basis for conviction (*see People v Arroyo*, 54 NY2d 567, 577 [1982], *cert denied* 456 US 979 [1982]). Thus, there exists a clearly valid line of reasoning from which the jury could have concluded that the victim's injury was produced by defendant's assaultive conduct. As to the contempt counts, the issuance of the orders of protection directing defendant to refrain from, inter alia, "assault," and defendant's awareness of those orders, taken together with the physical injury to the victim, provide a sufficient factual basis to sustain the verdict convicting defendant of criminal contempt and aggravated criminal contempt.

Finally, though defendant raises the issue only in passing, the verdict comports with the weight of the evidence (CPL 470.15 [5]). Defendant offered the improbable explanation that the

glass shards observed on the floor of the apartment had been present from the time he moved in, some six or seven months earlier, and had never been cleaned up. Furthermore, defendant denied arguing with the victim prior to her injury but nevertheless produced her letter stating that she had "punched the French door window . . . because we had an argument." The orders of protection issued against defendant reflect the tempestuous nature of his relationship with the victim. Thus, this Court is unable to conclude that "the trier of fact . . . failed to give the evidence the weight it should be accorded" (*People v Bleakley*, 69 NY2d 490, 495 [1987]).

Accordingly, the judgment of the Supreme Court, New York County (Charles J. Tejada, J.), rendered July 31, 2003, convicting defendant, after a jury trial, of two counts of aggravated criminal contempt, two counts of criminal contempt in the first degree and one count of assault in the third degree, and sentencing him, as a second felony offender, to concurrent terms of 2 to 4 years on the felony convictions and 1 year on the misdemeanor assault conviction, should be affirmed.

MAZZARELLI, SAXE, FRIEDMAN and SULLIVAN, JJ., concur.

Judgment, Supreme Court, New York County, rendered July 31, 2003, affirmed.